*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0291P (6th Cir.)
File Name: 00a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MCNEILUS TRUCK AND
MANUFACTURING, INC., a
Minnesota Corporation;
MCNEILUS FINANCIAL
SERVICES, INC., a Minnesota
Corporation; MCNEILUS
FINANCIAL, INC., a Texas
Corporation,
     *Plaintiffs-Appellants,*

No. 99-3219

     *v.*

STATE OF OHIO, ex rel. BETTY
MONTGOMERY, Attorney
General for the State of Ohio;
MITCHELL J. BROWN,
Commissioner of the Ohio
Bureau of Motor Vehicles, et
al.,
     *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 96-01122—Edmund A. Sargus, Jr., District Judge.

Argued: April 27, 2000

1

Decided and Filed:  August 31, 2000

Before:  GUY, BOGGS, and SUHRHEINRICH, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:** Gerald S. Duffy, SIEGEL, BRILL, GREUPNER,
DUFFY & FOSTER, P.A., Minneapolis, Minnesota, for
Appellants.   Chester T. Lyman, Jr., OFFICE OF THE
ATTORNEY GENERAL OF OHIO, Columbus, Ohio, Mark
D. Landes, ISAAC, BRANT, LEDMAN & TEETOR,
Columbus, Ohio, for Appellees.  **ON BRIEF:**  Gerald S.
Duffy, Steven Weintraut, William Christopher Penwell,
SIEGEL, BRILL, GREUPNER, DUFFY & FOSTER, P.A.,
Minneapolis, Minnesota, William H. Ise, Dodge Center,
Minnesota, D. Michael Crites, TEAFORD, RICH, CRITES &
WESP, Columbus, Ohio, for Appellants.  Mark D. Landes,
Lance Chapin, ISAAC, BRANT, LEDMAN & TEETOR,
Columbus, Ohio, James J. Schaefer, John J. Arnold,
HAMILTON COUNTY PROSECUTING OFFICE,
Cincinnati, Ohio, Jeffrey Lynn Glasgow, PROSECUTING
ATTORNEY'S OFFICE FOR THE COUNTY OF
FRANKLIN, Columbus, Ohio, Matthew L. Sagone, OFFICE
OF THE ATTORNEY GENERAL OF OHIO, Columbus,
Ohio, for Appellees.

_____

**OPINION**

_____

BOGGS, Circuit Judge.  This case grew out of an Act of the
legislature of the State of Ohio to amend the state's dealer
licensing laws.  In the spring of 1996, the Ohio Bureau of
Motor Vehicles ("OBMV") told dealers of remanufactured
vehicles they had to comply with certain requirements for
licensing by March 31, 1996, failing which their dealer

**VIII**

Although most of McNeilus's claims do not provide a basis
for overturning the ruling below, Ohio's statute
discriminatorily affects interstate commerce and is thus a per
se violation of the dormant Commerce Clause.  Therefore,
McNeilus's motion for a permanent injunction should be
GRANTED against the portion of the statute that offends the
dormant Commerce Clause.  The district court's judgment is
AFFIRMED in part, REVERSED in part, and the case is
REMANDED for the entry of a permanent injunction and any
further proceedings necessary under this opinion.

issue here, the statute is indefensible. There is not, for instance, a unique and overriding environmental benefit from the law that could justify its protectionist effects. *See Maine v. Taylor*, 477 U.S. 131, 141 (1986) (holding that a bar on the import of certain minnows was the only way for Maine to protect the state's waters from the accidental introduction of hazardous parasites and nonnative species). Indeed, the appellees turn the "availability of nondiscriminatory alternatives" analysis on its head and suggest that McNeilus could avoid the strictures of the regulation by 1) developing a franchise relationship with a truck manufacturer; 2) purchasing its chassis from authorized (Ohio) dealers; or, 3) switching to remanufacturing chassis purchased by its customers and then brought to it for conversion, as Ohio-based remanufacturers do. (State of Ohio's Brief, at 17). But the existence of alternatives is a burden for the state that precludes using the discriminatory method that it has chosen, not a way to shift the blame to McNeilus for the manner in which it runs its business. The state gives away the game when it concedes to discriminating against McNeilus's business model. It is precisely the protectionist effect of trying to force McNeilus to buy its truck chassis in Ohio that the dormant Commerce Clause proscribes.

## C

Even were Ohio's statute not so obviously discriminatory as to subject it to strict scrutiny review under the dormant Commerce Clause, the lack of any significant local benefit that does not already exist means that the State of Ohio could not demonstrate that the benefits of the statute outweigh even an incidental burden on interstate commerce posed by the state's licensing requirements. Thus, even were we to conclude that this statute only has an incidental effect on interstate commerce, we would still find that the burden it imposes is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

licenses would not be renewed upon their expiration that day. The OBMV backtracked later that year when state Senate Bill 182 amended and expanded the relevant laws, effective December 3, 1996. In pertinent part, the amended statute reads as follows:

Section 4517.02(E) No remanufacturer shall engage in the business of selling at retail any new motor vehicle without having written authority from the manufacturer or distributor of the vehicle to sell new motor vehicles and to perform repairs under the terms of the manufacturer's or distributor's new motor vehicle warranty, unless, at the time of the sale of the vehicle, each customer is furnished with a binding agreement ensuring that the customer has the right to have the vehicle serviced or repaired by a new motor vehicle dealer who is franchised to sell and service vehicles of the same line-make as the chassis of the remanufactured vehicle purchased by the customer and whose service or repair facility is located within either twenty miles of the remanufacturer's location and place of business or twenty miles of the customer's residence or place of business. If there is no such new motor vehicle dealer located within twenty miles of the remanufacturer's location and place of business or the customer's residence or place of business, the binding agreement furnished to the customer may be with the new motor vehicle dealer who is franchised to sell and service vehicles of the same line-make as the chassis of the remanufactured vehicle purchased by the customer and whose service or repair facility is located nearest to the remanufacturer's location and place of business or the customer's residence or place of business. Additionally, at the time of sale of any vehicle, each customer of the remanufacturer shall be furnished with a warranty issued by the remanufacturer for a term of at least one year . . . .

Section 4517.12(A) The registrar of motor vehicles shall deny the application of any person for a license as a

motor vehicle dealer, motor vehicle leasing dealer, manufactured home broker, or motor vehicle auction owner and refuse to issue the license if the registrar finds that the applicant:
. . . . (4) Is engaged or will engage in the business of selling at retail any new motor vehicles without having written authority from the manufacturer or distributor thereof to sell new motor vehicles and to perform repairs under the terms of the manufacturer's or distributor's new motor vehicle warranty, except as provided in division (C) of this section and except that a person who assembles or installs special equipment or accessories for handicapped persons, as defined in section 4503.44 of the Revised Code, upon a motor vehicle chassis supplied by a manufacturer or distributor shall not be denied a license pursuant to division (A)(4) of this section . . . .

Section 4517.12(C) Notwithstanding division (A)(4) of this section, the registrar shall not deny the application of any person and refuse to issue a license if the registrar finds that the applicant is engaged or will engage in the business of selling at retail any new motor vehicles and demonstrates all of the following in the form prescribed by the registrar:
(1) That the applicant has posted a bond, surety, or certificate of deposit with the registrar in an amount not less than one hundred thousand dollars for the protection and benefit of the applicant's customers except that a new motor vehicle dealer who is not exclusively engaged in the business of selling remanufactured vehicles shall not be required to post the bond, surety, or certificate of deposit otherwise required by division (C)(1) of this section;
(2) That, at the time of the sale of the vehicle, each customer of the applicant will be furnished with a binding agreement ensuring that the customer has the right to have the vehicle serviced or repaired by a new motor vehicle dealer who is licensed to sell and service vehicles of the same line-make as the chassis of the

**B**

Because Ohio's statute is protectionist, we must next ask whether the law falls within that narrow group of such laws that the state might show to be justified by factors unrelated to protectionism. "When discrimination against commerce . . . is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt*, 432 U.S. at 353, *citing Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951); *See also Pike*, 397 U.S. at 142. The State of Ohio does not meet that burden here, because it provides no ulterior justification for the law, aside from the putative benefits to consumers of remanufactured vehicles, which we have already rejected.

There are no doubt some legitimate state interests served by this statute. In particular, Ohio wants to ensure that its citizens are not tricked into buying vehicles for which they cannot get convenient service. As McNeilus points out, however, that interest is already met by neutral laws mandating that warranties be provided to customers, that dealers service vehicles of the brand they sell whether or not they sold the particular vehicle, and by contracts between chassis manufacturers and their franchisees mandating such service. The state adverted to other interests served by the statute, such as one-stop shopping for warranty service on all parts of a vehicle, though a binding agreement would still seem to require a stop at McNeilus for service to add-ons and a stop at the dealer for chassis service. The state also mentions preventing an unsuspecting customer from buying a vehicle whose warranty only covers chassis service in California, but it points to no chassis manufacturer for which this would be true and no remanufacturer engaging in such a practice.

Given the presence of reasonable nondiscriminatory alternatives adequate to serve the legitimate local interests at

the interstate market, not particular interstate firms, from prohibitive or burdensome regulations,'" this is not a permissible case of a regulation that incidentally causes a shift of business from an out-of-state firm to an in-state firm; rather, this is an impermissible case of a discriminatory regulation that burdens interstate commerce. *Clover Leaf Creamery*, 449 U.S. at 474, *quoting Exxon Corp.*, 437 U.S. at 127-28. The fact that the burden is borne predominantly by one out-of-state firm matters not at all.

There is also evidence that Ohio's statute was passed with a discriminatory purpose, which could also invalidate the law. *See, e.g., Pete's Brewing Co. v. Whitehead*, 19 F. Supp. 2d 1004, 1015 (W.D. Mo. 1998) (striking down a neutrally-worded beer labeling law that indirectly burdened out-of-state brewers and was lobbied for by in-state brewing interests); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977). In both *Pete's Brewing* and *Hunt*, the record indicated that local producers sought the legislation and that consumers had not complained about any problems the regulations ostensibly cured. The same is true in this case. McNeilus points to several letters by in-state dealers and remanufacturers to the Ohio legislature seeking this legislation. These dealers admitted in deposition testimony that customers had not complained about servicing arrangements with out-of-state remanufacturers like McNeilus. This evidence of discriminatory purpose surpasses that deemed insufficient in past dormant Commerce Clause cases in this circuit. *See, e.g., Eastern Kentucky Resources*, 127 F.3d 532. As in *Hunt*, however, "we need not ascribe an economic protection motive to the [Ohio] Legislature to resolve this case." *Hunt*, 432 U.S. at 352. The statute's discriminatory impact on interstate commerce is manifest and it cannot be upheld, even if truly enacted to protect consumers of remanufactured vehicles.

remanufactured vehicle purchased by the customer and whose service or repair facility is located within either twenty miles of the applicant's location and place of business or twenty miles of the customer's residence or place of business. If there is no such new motor vehicle dealer located within twenty miles of the applicant's location and place of business or the customer's residence or place of business, the binding agreement furnished to the customer may be with the new motor vehicle dealer who is franchised to sell and service vehicles of the same line-make as the chassis of the remanufactured vehicle purchased by the customer and whose service or repair facility is located nearest to the remanufacturer's location and place of business or the customer's residence or place of business.
(3) That, at the time of the sale of the vehicle, each customer of the applicant will be furnished with a warranty issued by the remanufacturer for a term of at least one year;
(4) That the applicant provides and maintains at the applicant's location and place of business a permanent facility with all of the following:
(a) A showroom with space, under roof, for the display of at least one new motor vehicle;
(b) A service and parts facility for remanufactured vehicles;
(c) Full-time service and parts personnel with the proper training and technical expertise to service the remanufactured vehicles sold by the applicant.

OHIO REV. CODE ANN. §§ 4517.02(E), 4517.12(A), and 4517.12(C) (Banks-Baldwin 1997).

The McNeilus Truck and Manufacturing Company and related entities ("McNeilus") challenge the constitutionality of these provisions on their face and as applied to McNeilus. The company filed its initial complaint in the United States District Court for the Southern District of Ohio on November 4, 1996, alleging that Ohio's requirements for

licensing of vehicle remanufacturers are unconstitutional. McNeilus, which is in the business of buying truck chassis from various manufacturers, installing concrete transit mixers or refuse packer bodies on them, and reselling the complete units directly to customers, claims that the statutory provisions effectively prohibit the company from engaging in the sale of these remanufactured trucks in Ohio, and subject it to possible criminal prosecution there.

This court affirmed the district court's denial of McNeilus's prior motion for a preliminary injunction in a February 28, 1998 order. *See McNeilus Truck and Mfg., Inc. v. State of Ohio*, No. 97-3024, 1998 WL 96580 (6th Cir. Feb. 27, 1998). McNeilus then amended its complaint to add the county prosecutors as defendants. On May 22, 1998, the district court granted partial summary judgment to defendants, finding that McNeilus could not challenge the statute under the Sherman Antitrust Act, and that there was not jurisdiction to address pendent state law claims. Following an August 31, 1998 bench trial, the district court granted judgment in favor of defendants on all remaining issues. On appeal, McNeilus seeks either a declaratory judgment that its warranties to customers are binding agreements that put it in compliance with a fair construction of the statute devoid of constitutional infirmities, or a permanent injunction against any unavoidably unconstitutional portions of the statute. *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

## I

When OBMV sent notice to dealers of remanufactured vehicles that they had to comply with the law at issue here, McNeilus sought interpretive guidance. OBMV interpreted the statute to require McNeilus to enter into "binding agreements" with franchised dealers, for each brand of chassis sold by McNeilus, located within 20 miles of McNeilus's Gahanna, Ohio branch office (or, somewhat impractically, with such dealers within 20 miles of every one of its customers) to remain licensed. In an effort to comply,

from signing binding agreements with companies like McNeilus, because such companies do not buy their chassis from Ohio dealers. In contrast, in-state remanufacturers who do buy their chassis from those dealers will have no problem satisfying the license requirements. In-state remanufacturers might want to purchase chassis that are manufactured outside the state, but there is little likelihood that they will want to acquire chassis from out-of-state dealers. McNeilus, on the other hand, must either start purchasing chassis from in-state dealers, or else stop doing business in Ohio. Either way, the in-state dealers and remanufacturers benefit under the statute to the exclusion of out-of-state remanufacturers and to the detriment of interstate commerce.

The statute at issue here definitely threatens to slow the flow of out-of-state remanufactured vehicles into Ohio, an effect that distinguishes the statute from others that have been upheld under dormant-Commerce-Clause analysis. *See, e.g., Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978) (upholding a Maryland statute providing that petroleum product producers/refiners cannot operate retail service stations in the state, noting that the statute has "no impact on the relative proportions of local and out-of-state goods sold in Maryland"); *Clover Leaf Creamery*, 449 U.S. at 472-73 (upholding a state law prohibiting the sale of milk in disposable plastic containers, but allowing its sale in disposable paper cartons, in part because "there is no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms").

Statutes can be negated under the dormant Commerce Clause even where their effect is produced indirectly; however, the denial of a license in this case directly burdens the interstate market. *Cf. Buck v. Kuykendall*, 267 U.S. 307 (1925) (holding that the denial by the State of Washington of a certificate needed to run an auto stage line between Portland and Seattle violated the commerce clause, because the denial not only burdened interstate commerce, but obstructed it completely). And although "the Commerce Clause 'protects

however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, [the Supreme Court has] examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In either situation the critical consideration is the overall effect of the statute on both local and interstate activity. See *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440-41 (1978).

*Ferndale Labs., Inc. v. Cavendish*, 79 F.3d 488, 494-95 (6th Cir. 1996) (brackets in original), *quoting Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578-79 (1986).

## A

We must first ask whether Ohio's statute is a protectionist measure. If Ohio's statute directly discriminates against interstate commerce in favor of Ohio business, it is "per se invalid, save in a narrow class of cases in which the [state] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994). Should we conclude that Ohio's statute directly, in effect, or in purpose treats in-state and out-of-state interests differently, the dispositive issue will become whether the statute serves a legitimate state interest that cannot otherwise be met.

On its face, Ohio's statute is neutral in application. Whether a remanufacturer is located within the state of Ohio or outside of it, it must comply with the statute's requirements to obtain a license. Looked at more closely, however, the statute has a discriminatory effect. As McNeilus urges, the binding agreements that the statute requires it to obtain from local dealers are much harder for an out-of-state remanufacturer to obtain. As the statute's drafters surely recognized, in-state truck chassis dealers stand to gain nothing

McNeilus contacted chassis dealers throughout Ohio seeking the mandated "binding agreements" to service truck chassis on the vehicles it sold, but the vast majority of dealers—including all of those within 20 miles of the Gahanna office—refused. One even returned McNeilus's certified letter requesting a binding agreement with the inscription "Go to Hell."

McNeilus nonetheless purports to be in compliance. McNeilus's remanufactured vehicle customers receive a warranty for the chassis from the truck chassis manufacturer, a warranty for the add-on component from McNeilus, and, frequently, an additional warranty for the engine from its manufacturer. McNeilus is not authorized to service the chassis, and doing so could void the warranty. Hence, McNeilus's customers must obtain chassis service as needed from Ohio chassis dealers, whose franchise agreements with the chassis manufacturers require them to provide such service, and which Ohio law already mandates. *See* OHIO REV. CODE § 1345.72. McNeilus asserts that the warranties it gives customers create service obligations that combine with the contracts between chassis manufacturers and dealers, also creating service obligations, and state laws requiring franchisees to service any chassis of the kind they sell, to constitute "binding agreements" that satisfy the statute.

OBMV appears to interpret the statute to require binding agreements *between McNeilus and chassis dealers*, though it hedges before this court on whether it would enforce the statute in such a manner and notes that it has renewed McNeilus's license throughout the course of this litigation. McNeilus complains that OBMV's interpretation allows Ohio chassis dealers (with whom it competes for business by importing chassis from out of state) to boycott McNeilus and prevent it from doing business in Ohio. In contrast, in-state truck remanufacturers generally buy their chassis from dealers in the state and are thus able to secure the necessary binding agreements. The state responds that the statute does not discriminate against out-of-state companies so much as

against companies (of which McNeilus is apparently the sole example) with McNeilus's particular business model, and argues that the statute merely ensures that Ohio consumers will not end up with vehicles that cannot be serviced conveniently in the state. McNeilus replies that its customers can already have their vehicles serviced conveniently, and suggests that the redundant statutory scheme was passed with an impermissible protectionist intent to disadvantage out-of-state remanufacturers or force them (or their customers) to purchase chassis made in Ohio. Either way, McNeilus alleges that this anti-competitive state of affairs violates the Constitution and federal antitrust law.

McNeilus asserts that the disputed provisions of the statute violate the Constitution in a number of ways. First, McNeilus argues that the statute violates procedural due process under the Fourteenth Amendment, because the OBMV failed to comply with state-mandated rulemaking procedures in crafting its interpretation of the statute. Second, McNeilus argues that the statute is void for vagueness, for providing inadequate notice of its requirements, and for failing to prevent official arbitrariness in violation of the Due Process Clause. Third, McNeilus contends that the measure further violates substantive due process by interfering with the company's right to pursue a lawful business. Fourth, McNeilus claims that the statute violates the Equal Protection Clause by excessively burdening out-of-state remanufacturers. Next, McNeilus argues that the statute is preempted by the Sherman Antitrust Act. And last, but not in this case least, McNeilus contends that the statute runs afoul of the Constitution's dormant (or negative) Commerce Clause.

Because we agree that OHIO REV. CODE §§ 4517.02(E), 4517.12(A)(4), and 4517.12(C) discriminatorily affect interstate commerce in violation of the dormant Commerce Clause, we will reverse the judgment below on those grounds and remand the case to the district court with instructions to grant a permanent injunction against the offending portions of the statute.

against the State of Ohio. As the district court held, Ohio's statute does not "mandate conduct that necessarily constitutes a violation of the Sherman Act in all cases, and there is no pressure on any party to violate the Sherman Act in order to comply with [the] statutes." In short, Ohio's statute may well have anticompetitive effects. It no doubt facilitates either coordinated action, if such there be, or else uncoordinated (though perhaps conscious) parallel action by dealers in refusing to enter binding agreements, but the statute neither authorizes nor requires that dealers engage in behavior proscribed by the federal antitrust laws. Thus, it is the behavior of the dealers or the dealer association, and not of the state, that McNeilus must attack if it is to proceed under the antitrust laws.

## VII

Finally, McNeilus asserts that Ohio's statute is void because it impermissibly regulates interstate commerce. Without ever quite saying so, McNeilus invokes the dormant Commerce Clause in challenging the statute's constitutionality. "This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992), *quoting New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273-74 (1988). Under dormant-Commerce-Clause analysis, courts take a two-tiered approach in determining the permissibility of state economic regulations not authorized by Congress:

When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [the Supreme Court has] generally struck down the statute without further inquiry. See, *e.g., Philadelphia v. New Jersey*, 437 U.S. 617 (1978); *Shafer v. Farmers['] Grain Co.*, 268 U.S. 189 (1925); *Edgar v. MITE Corp.*, 457 U.S. 624, 640-43 (1982) (plurality opinion). When,

of a license, as was the case in *Topco*. Furthermore, the issuance of a license from a state authority is not the same as the issuance of one from a private association.

McNeilus next contends that the statute offends the Act by authorizing a boycott against McNeilus by in-state dealers. Group boycotts by traders against other traders are per se illegal under the Sherman Antitrust Act. *See COM-TEL, Inc. v. DuKane Corp.*, 669 F.2d 404, 409 (6th Cir. 1982). That said, the statute does not explicitly authorize a boycott. Nor is the state's passing of the statute the kind of behavior to which the boycott cases speak. Rather, they discuss concerted actions by trade associations. McNeilus may well face a refusal to deal by individual dealers, but no chassis dealer or association of dealers is party to this suit. It is true that the statute creates the good (the "binding agreement") that McNeilus would otherwise have no reason to acquire from the chassis dealers, but creation of that good does not mandate or authorize a refusal to deal in that good.

Similarly, McNeilus's arguments about "state action" immunity are misplaced. McNeilus argues that a state law cannot be the basis for antitrust immunity. *See Northern Secs. Co. v. United States*, 193 U.S. 197 (1904). That is true so far as it goes, but McNeilus completely misses the import of *Federal Trade Commission v. Ticor Title Insurance Co.*, 504 U.S. 621 (1992). *Ticor* held that a state law could not excuse a private entity's illegal anticompetitive behavior absent active regulatory supervision. *Ticor* does not address the legality of a state law that itself fosters anticompetitiveness. Such laws are generally governed by the doctrine of *Parker v. Brown*, 317 U.S. 341 (1943). However, we need not delve into the intricacies of that doctrine here, because it does not apply where the state does not authorize or actively supervise the anticompetitive scheme, which we hold Ohio does not. *See Ticor*, 504 U.S. at 633.

McNeilus's arguments might have merit if brought against the Ohio dealers, but they make no sense at all in a suit

## II

The case below was decided in part on summary judgment and in part after a trial. For that part of the case decided on summary judgment, this court reviews the judgment *de novo*, but it reviews the district court's findings of fact at trial for clear error. *See Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Mich. Dep't of Natural Resources*, 141 F.3d 635, 639 (6th Cir. 1998), *citing Russo v. City of Cincinnati*, 953 F.2d 1036, 1041-42 (6th Cir. 1992) *and Eastern Kentucky Resources v. Fiscal Court of Magoffin County*, 127 F.3d 532, 539-40 (6th Cir. 1997). However, lower court findings of ultimate facts based upon the application of legal principles to subsidiary facts are subject to *de novo* review. *See Whitney v. Brown*, 882 F.2d 1068, 1071 (6th Cir. 1989); *Taylor and Gaskin, Inc.*, v. *Chris-Craft Indus.*, 732 F.2d 1273, 1277 (6th Cir. 1984). In this case, the district court's decision consists almost entirely of questions of law. One notable exception is the finding that the stated purpose of the statute at issue was a proper public purpose, which is a mixed question of fact and law and still subject to *de novo* review (contrary to the view of both sides that mixed questions of fact and law are reviewed for abuse of discretion). *See Howard v. Grinage*, 82 F.3d 1343, 1348-49 (6th Cir. 1996) (citations omitted).

## III

Before we analyze the substance of McNeilus's claims, a few preliminary procedural issues must be addressed. Specifically, we must decide whether the district court erred in dismissing Ohio's Attorney General and certain county prosecutors from the case pursuant to the *Ex parte Young* doctrine. We believe it did. An action seeking to enjoin enforcement of an allegedly unconstitutional statute through a suit against state officials charged with its enforcement is not barred by the Eleventh Amendment. *See Ex parte Young*, 209 U.S. 123 (1908); *Zielasko v. State of Ohio*, 873 F.2d 957 (6th Cir. 1989). Where there is an imminent threat of

enforcement, the Attorney General and all county attorneys are proper defendants. Under *Ex parte Young*, McNeilus would be able to seek injunctive relief against all of them. The Attorney General and Commissioner of the OBMV seek to have their dismissal upheld, because they claim not to be empowered to enforce the criminal components of the statute. The OBMV, however, has threatened to withdraw McNeilus's license, and the Attorney General helps enforce the noncriminal portions of the statute. *Ex parte Young* suits may be commenced to enjoin civil or criminal actions, so both the Attorney General and the OBMV Commissioner are proper defendants.

The prosecutors in counties where McNeilus has never sold a vehicle seek to have their dismissal upheld, because there is no current risk that they could prosecute McNeilus. The county prosecutors where McNeilus has sold vehicles seek to have the district court's assertion of jurisdiction over them reversed, arguing that because they have not "threatened" prosecution, it cannot be imminent. The *Ex parte Young* doctrine does not apply when the defendant official has neither enforced nor threatened to enforce the statute challenged as unconstitutional. *See Children's Healthcare Is A Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1414 (6th Cir. 1996). In this case, the OBMV has threatened to revoke McNeilus's license, so the officials charged with enforcing the statute are properly named defendants. Some county prosecutors are necessary as defendant parties in an action brought under *Ex parte Young* challenging the constitutionality of an Ohio criminal statute. *See Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 210-11 (6th Cir. 1997). Because some, but not all, county prosecutors are necessary defendants to maintain this action, the district court properly dismissed the county prosecutors in the 47 counties where McNeilus has never sold vehicles, and it properly retained jurisdiction over the others.

A second preliminary question we must decide is whether the district court erred in refusing to consider McNeilus's

*Corp. v. Faulkner*, 516 U.S. 325, 345 (1996). Under this rather lax standard, Ohio's belt-and-suspenders approach to regulation passes muster, because the redundant nature of the statute does not preclude its being rationally related to protecting Ohio consumers of remanufactured vehicles. In short, the plausible, albeit dubious, explanations given by Ohio for the statute suffice to establish a rational relation to a legitimate state end, which is all that equal protection requires.

## VI

McNeilus next suggests that the statute violates the Sherman Antitrust Act in a variety of ways, and claims that Act preempts the state statute's "binding agreement" requirement. McNeilus correctly states the precondition for a state statute to violate federal antitrust law:

> [A] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.

*Rice v. Norman Williams Co.*, 458 U.S. 654, 661 (1982). Having laid out this standard, however, McNeilus invokes several inapposite precedents to make its case for the anticompetitive nature of the statute.

First, McNeilus suggests that the antitrust laws bar any statute that allows one competitor veto power over another, citing *United States v. Topco Associates, Inc.*, 405 U.S. 596, 602 (1972). *Topco* forbade an association of grocery stores from giving veto power to its members over licenses to new marketers of the association's Topco brand in their areas. It has no application to this case, because McNeilus does not allege that the Ohio chassis dealers are acting in concert under the rubric of an association. Nor does the refusal of any one dealer to enter into a binding agreement prevent the issuance

purpose, the company's ability to operate in the state. In holding otherwise, according to McNeilus, the district court unjustifiably assumed a proper public purpose for the license requirements in protecting Ohio consumers, whereas the only evidence indicates an intent to insulate Ohio chassis dealers from competition. McNeilus asks this court to look behind the stated purpose of the statute to whether the hidden purpose is legitimate; however, for purposes of equal protection analysis, we must assume that the state's stated purposes are the actual ones, unless those purposes "could not have been a goal of the legislation." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981), *quoting Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975). McNeilus would have to demonstrate that the legislative facts asserted by the state "could not reasonably be conceived to be true," which it has not done, in order for this court to abandon the assumption that the stated purposes are the actual ones. *Clover Leaf Creamery*, 449 U.S. at 464, *quoting Vance v. Bradley*, 440 U.S. 93, 111 (1979).

We then ask whether the stated purposes are legitimate public purposes; we do not assume it. This explains why McNeilus's reliance on *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869 (1985), is misplaced. In striking down a differential tax on out-of-state insurers on equal protection grounds, the Supreme Court did not look behind the stated purposes of the statute. Rather, it determined that the stated purposes of promoting domestic industry and local investment in a purely discriminatory fashion were illegitimate. Indeed, they were deemed the "very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." *Id.* at 879. In this case, as the district court determined, the stated purpose of assuring "that a purchaser of a concrete transit mixer or refuse packer should have reasonable access to a manufacturer or dealer which is authorized to repair a defective chassis under warranty" *is* a legitimate purpose under the state's police powers. Finally, in equal protection analysis, we adjudge whether the statute passed is rationally related to the legitimate purpose that motivated it. *See Fulton*

state law claims, holding that they were barred from adjudication in federal court by the Eleventh Amendment. McNeilus complains that the OBMV did not, as it must, "execute authority reasonably and in a manner consistent with the objectives and standards that governing statutes impose." *State ex rel. Hoover Co. v. Mihm*, 76 Ohio St. 3d 619, 624 (Ohio 1996). The district court held that the Eleventh Amendment precludes a federal court from taking supplemental jurisdiction over claimed state law violations by state officers. In addition, the district court ruled that consideration of any state-law-based claims would violate the Eleventh Amendment, because the defendants were all named in their official capacities rather than as individuals. We agree. To the extent that McNeilus seeks to sue state officials in a federal court for violating state law, such a suit is indeed barred. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 123 (1984). This is true even though there would otherwise be supplemental jurisdiction. Though roundly criticized, the *Pennhurst* decision is the governing Supreme Court precedent, whose wisdom this court may call into question, but whose command this court must follow.[1] McNeilus argues that the Supreme Court has interpreted the Eleventh Amendment *not* to bar an injunction against a state official for enforcing an unconstitutional state law. It is true that under the *Ex parte Young* doctrine, state officers may

---

[1]This suit provides a concrete example of why the rule of *Pennhurst* is flawed. Here there is a matter arising from a "common nucleus of operative facts" that could be adjudicated with little difficulty in this forum on state law grounds. Prior to *Pennhurst*, similar cases were decided in such a way. *See Bank of United States v. Planters' Bank*, 22 U.S.(9 Wheat.) 904 (1824). In at least one case during that time, federal constitutional claims were ignored in order to decide the case on state law grounds and avoid deciding unnecessary constitutional questions. *See Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 191 (1909). Unfortunately, that path is no longer available to lower federal appellate courts, because *Pennhurst* "overrul[ed] the entire history of *Siler/Ashwander* doctrine in cases where injunctive relief is requested against the state." *Cuesnongle v. Ramos*, 835 F.2d 1486, 1497 (1st Cir. 1987).

ordinarily be sued in an official capacity for injunctive relief, but only for those officials' violations of federal law. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10. (1989). McNeilus has brought an action for injunctive relief, challenging the constitutionality of Ohio's statute. Of course if the law is found to be unconstitutional, that would be a federal defect in the law, and not a state defect barred from a federal court's consideration by *Pennhurst*.

### IV

We now turn to the merits of McNeilus's constitutional arguments, the first of which is that Ohio's statute violates constitutional due process, because the OBMV failed to follow proper rulemaking procedures in issuing its interpretation of binding agreements under the statute. OBMV concedes that it issued interpretive rules without engaging in state-mandated rulemaking procedures; however, McNeilus cannot resurrect its state law claims, for which pendent jurisdiction is barred by the rule of *Pennhurst*, merely by casting its argument in constitutional terms. When the OBMV informed McNeilus that it would be denying its application for renewal of license, it did so on the grounds that McNeilus was not in compliance with a rule interpretation that the OBMV had not issued through proper rulemaking procedures. McNeilus asserts that it violates the Fourteenth Amendment for a state not to follow its own rulemaking procedures. However, whether state officers have violated state law in failing to follow administrative procedures is a state law question in the first instance, and this court still lacks supplemental jurisdiction to consider the claim. *Cf. Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993), *citing Engle v. Isaac*, 456 U.S. 107 (1982) ("A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable").

McNeilus also argues that the statute is void for vagueness, lack of notice, and for enabling official arbitrariness. We disagree. The challenged statute is very specific in its requirements and puts those affected on adequate notice. Indeed, the OBMV contacted McNeilus to inform it of the requirements it would have to fulfill. Nor does the record evince any arbitrary enforcement aside from the differential impact on out-of-state interests already covered by other claims. McNeilus contends that Ohio's statute further violates the Due Process Clause by interfering with the company's right to pursue a lawful business, because the license does not protect customers or any public interest not already otherwise adequately protected. McNeilus neither explains how such interference violates due process, nor distinguishes this regulation from the kind upheld in the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873).

What McNeilus calls a due process argument looks like a complaint that Ohio runs afoul of the Privileges and Immunities Clause by denying an out-of-state company the right to run a business that is lawful for an in-state company to run. *See* U.S. CONST. art. IV, § 2, cl. 1; *See also Toomer v. Witsell,* 334 U.S. 385, 396 (1948) ("[I]t was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State") (citations omitted); David P. Currie, *The Constitution in the Supreme Court: Article IV and Federal Powers, 1836-1864*, 1983 DUKE L.J. 695, 697 n.14 (discussing historical interpretations of the clause). But whatever the company's argument intends, it is settled law that the Privileges and Immunities Clause does not apply to corporations, and we therefore decide the case on other grounds. *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868).

### V

Next, McNeilus argues that Ohio's statute violates the Equal Protection Clause by curtailing, without a legitimate