*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0400p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TRITENT INTERNATIONAL CORP. et al.,
                *Plaintiffs-Appellants,*

    *v.*

COMMONWEALTH OF KENTUCKY,
                *Defendant-Appellee.*

No. 05-6791

>

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 04-00067—Joseph M. Hood, Chief District Judge.

Argued: September 20, 2006

Decided and Filed: October 30, 2006

Before: CLAY and GILMAN, Circuit Judges; STAFFORD, District Judge.[*]

---

## COUNSEL

**ARGUED:** David F. Dobbins, PATTERSON, BELKNAP, WEBB & TYLER LLP, New York, New York, for Appellants. Gary D. Wilson, Washington, D.C., for Appellee. **ON BRIEF:** David F. Dobbins, PATTERSON, BELKNAP, WEBB & TYLER LLP, New York, New York, Melinda G. Wilson, M.G. WILSON, PLLC, Lexington, Kentucky, for Appellants. James M. Herrick, Michael Plumley, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

---

## OPINION

---

    RONALD LEE GILMAN, Circuit Judge. Plaintiffs Cibahia Tabacos Especias Ltda. (a Brazilian cigarette manufacturer), Tritent International Corp. (an importer of Cibahia's cigarettes), and DWI, LLC (a Kentucky wholesaler of those cigarettes) (collectively, Tritent), filed suit against the Commonwealth of Kentucky, arguing that two Kentucky statutes have effectively prohibited Tritent from doing business in the state. The statutes were enacted to effectuate and enforce the provisions of the Master Settlement Agreement (MSA), a voluntary agreement that has been entered into by 46 states (the settling states) and most tobacco companies. Tritent alleges that because it is

---

[*] The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

not a party to the MSA, it has been adversely affected by anticompetitive behavior that has occurred as a result of the Kentucky legislation.

In its lawsuit against the state, Tritent alleged that the Kentucky statutes are preempted by the Sherman Act, 15 U.S.C. § 1, both because the state statutes mandate or authorize unlawful anticompetitive behavior and because they constitute a hybrid restraint on trade. The district court granted Kentucky's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Tritent timely appealed. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

# I. BACKGROUND

## A.     Factual background

### 1.        *The MSA*

In the early to mid-1990s, more than 40 states commenced litigation against the tobacco industry, seeking monetary, equitable, and injunctive relief under various consumer-protection and antitrust laws. The general theory of these lawsuits was that the cigarettes produced by the tobacco industry contributed to health problems among the population, which in turn resulted in significant costs to the states' public health systems. In response to the various state lawsuits, the tobacco industry mounted a vigorous defense, denying the states' allegations of wrongdoing. With no end to the litigation in sight, the states and the tobacco industry began collaborating on a settlement agreement.

In 1998, the Attorneys General of 46 states, as well as of the District of Columbia, Puerto Rico, and the Virgin Islands, entered into the MSA with the four largest manufacturers of cigarettes in the United States. These four manufacturers—Philip Morris, RJ Reynolds, Brown & Williamson, and Lorillard—are referred to in the MSA as the Original Participating Manufacturers (OPMs). At the time the MSA became effective, the OPMs collectively controlled approximately 97% of the domestic market for cigarettes.

The purposes of the MSA, from the viewpoint of the settling states, were to prevent youth smoking, to promote public health, and to secure monetary payments from the tobacco manufacturers. In exchange for the OPMs' cooperation in achieving these purposes, the settling states agreed to drop any pending claims against the tobacco industry and to refrain from filing additional claims. The OPMs, as discussed in detail below, agreed in turn to implement various tobacco-related health measures and to make payments to the settling states in perpetuity. In the MSA, the OPMs agreed to pay a minimum of $206 billion over the first twenty-five years of the agreement.

Since 1998, approximately 41 additional tobacco companies have joined the MSA. These companies, referred to as the Subsequent Participating Manufacturers (SPMs), are bound by the MSA's restrictions and must make payments to the settling states as set forth in the MSA. Collectively, the OPMs and the SPMs are referred to as the Participating Manufacturers (PMs). Any tobacco company choosing not to participate in the MSA is referred to as a Nonparticipating Manufacturer (NPM).

The amount of money that the PMs are required to annually contribute to the states varies according to several factors. All payments are based primarily on the number of cigarettes sold. For the OPMs, the payments are determined in accordance with their relative market share as of 1997. The payment amount of a particular OPM is also dictated by the "Volume Adjustment," which compares the number of cigarettes sold in each payment year to the number of cigarettes sold in 1997. If the number of cigarettes sold by an OPM in a given year is less than the number it sold

in 1997, the Volume Adjustment allows that OPM to reduce its payment to the settling states. In other words, a reduction in the amount of cigarettes sold by the OPMs results in the settling states receiving less money.

The annual payments of the SPMs are determined by their relative market share as compared to other SPMs. For the SPMs that joined the MSA within 90 days of its execution, the annual payments are determined by the number of cigarettes an SPM sells beyond the "grandfathered" volume—calculated as the higher of either the individual SPM's market share in 1998 (the year the MSA was executed) or 125% of the SPM's market share in 1997. If an SPM's sales volume or market share declines below the grandfathered amount, then it is not required to make any payments to the settling states. SPMs that failed to join the MSA within 90 days of its execution do not receive the benefit of any grandfathered amount.

The payments from the PMs are deposited into an escrow account until disbursement to the settling states. Each state receives a payment equal to its "Allocable Share," a percentage of the funds held in escrow that has been agreed upon by the settling states and memorialized in the MSA. This "Allocable Share" (as measured by a percentage of the total funds in escrow) does not vary according to how many cigarettes are sold in a particular state in a given year.

During the drafting of the MSA, the OPMs and the settling states contemplated that many of the smaller tobacco companies would choose not to join the MSA. This failure to join posed a potential problem for both the OPMs and the settling states. The OPMs worried that the NPMs, both because they would not be bound by the advertising and other restrictions in the MSA and because they would not be required to make payments to the settling states, would be able to charge lower prices for their cigarettes and thus increase their market share.

Although the settling states' motivation was different from that of the OPMs, these states also were concerned about the effect of the tobacco companies that refused to join the MSA. The settling states worried that the NPMs would be able to regulate their sales so as to stay afloat financially while at the same time being effectively judgment-proof. As a result of these twin concerns, the OPMs and the settling states sought to have the MSA provide these other tobacco companies with incentives to join the agreement.

One such incentive, called the NPM Adjustment, provides that the payments by the PMs to the settling states may be adjusted according to the "NPM Adjustment Percentage." According to this provision, if a nationally recognized firm of economic consultants determines that the PMs have lost market share as a result of compliance with the MSA, the PMs' required payments to the settling states will be reduced to account for the loss. The NPM Adjustment therefore gives the settling states an incentive to protect the market dominance of the PMs, because otherwise the settling states themselves will receive less funds.

In addition to the NPM Adjustment, the MSA contains other provisions to protect the PMs. Primary among these provisions is a requirement that the settling states adopt "complementary" legislation to effectuate the MSA, with a failure to do so resulting in substantial reductions in the yearly payments. This complementary legislation, enacted by Kentucky and the other settling states, is the subject of the present case.

### 2.    *Kentucky's Escrow Statute*

As discussed above, Kentucky and the other settling states wanted NPMs to participate in the MSA's public health provisions or to be otherwise accountable for the harms caused by their products. Section 131.602 of the Kentucky Code, commonly referred to as the Escrow Statute, was part of the complementary legislation designed to address this concern. The Escrow Statute requires "[a]ny tobacco product manufacturer selling cigarettes to consumers within [Kentucky], whether

directly or through a distributor, retailer, or similar intermediary or intermediaries," to do one of the following: (1) join the MSA as an SPM, or (2) deposit into escrow an amount determined by the statute, currently 1.67539 cents per cigarette sold in Kentucky (or approximately 33.5 cents per pack). While the funds are held in escrow, the NPM receives any interest earned on the funds it deposits.

As originally enacted, the Escrow Statute provided for the release of the funds under any of the following three circumstances:

> (a) To pay a judgment or settlement on any released claim brought against such tobacco product manufacturer by Kentucky or any releasing party located or residing in Kentucky. . . .

> (b) To the extent that [an NPM] establishes that the amount it was required to place into escrow in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the [MSA] . . . had it been a participating manufacturer, the excess shall be released from escrow and revert back to such [NPM].

> (c) To the extent not released from escrow under paragraphs (a) and (b) of this subsection, funds shall be released from escrow and revert back to such [NPM] twenty-five (25) years after the date on which they were placed into escrow.

Ky. Rev. Stat. § 131.602 (2)(a-c) (2000).

Subsection (2) of the Escrow Statute, as originally drafted, is referred to as the "Allocable Share Release" (ASR) provision. This provision allowed an NPM to receive a refund of all payments in excess of the amount that it would have had to pay to Kentucky had the NPM been a PM.

The ASR provision was intended to equalize the payments made under Kentucky's Escrow Statute and the hypothetical payment that the NPM would have been required to make had it been a PM. For tobacco companies that sold cigarettes on a nationwide scale, the ASR provision served its desired purpose; the escrow obligations and the hypothetical MSA obligations were substantially the same. Not all companies, however, followed this nationwide business model. Some companies followed a regional business model, selling their products only in Kentucky and a few other states. As a result, those companies were able to obtain refunds of most of the money they placed in escrow. A brief hypothetical scenario will help to illuminate the disparity between the two business models.

Assume that an NPM operating on a nationwide scale would have been required to pay $100,000 total to the settling states if it had joined the MSA. Because Kentucky's Allocable Share is approximately 1.68%, Kentucky would have received no more than $1,680 from the NPM in the hypothetical event that the NPM became an SPM. The NPM, pursuant to the ASR provision, would have been entitled to a release of any escrowed funds in excess of the $1,680—meaning that the monetary obligation to Kentucky of an NPM was similar to that of an SPM. Under this business model, of course, the NPM would have had similar escrow obligations in the other settling states.

Assume now that the NPM operated only in Kentucky. Regardless of the number of cigarettes sold in Kentucky, the NPM would pay the flat-rate-per-cigarette intended to be equivalent to that paid by an SPM selling the same number of cigarettes nationwide. The difference, though, is that the NPM would still be entitled to a release of all escrowed funds above the 1.68% that it would have had to pay Kentucky under the MSA—even though all of its sales were targeted in Kentucky (meaning that it had no escrow obligations in the other settling states). As a result of this

disparity, NPMs operating on a regional level were able to reclaim most of the funds they placed in escrow. This in turn allowed the NPMs to artificially lower their prices, which, according to Kentucky, made the NPMs' cigarettes more attractive to "price-sensitive youth." Kentucky also believed that this practice resulted in disproportionate harm because, although the NPMs significantly contributed to cigarette sales in Kentucky, they did not contribute in a proportional manner to the funds held in escrow.

As a result of the business practices of various NPMs, Kentucky repealed the ASR provision in 2004. The amended version of the statute now reads as follows:

> (b) To the extent that [an NPM] establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the [MSA] settlement payments, as determined pursuant to section IX(i) of that agreement, including after final determination of all adjustments, that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such [NPM] . . . .

Ky. Rev. Stat. § 131.602(2)(b)(2004).

Rather than being based on Kentucky's Allocable Share (the 1.68% that Kentucky is entitled to under the MSA), the escrow obligation under the amended version (also known as the ASR Repealer) corresponds to the total MSA payment the NPM would have been required to pay had it been an SPM. As a result of the ASR Repealer, every manufacturer whose cigarettes are sold in Kentucky, regardless of where else the cigarettes are sold, is required to assume the same monetary obligation per cigarette that it would have incurred under the MSA, whether or not it actually joined the agreement.

### 3.        *Kentucky's Contraband Statute*

The other key piece of complementary legislation is § 131.610 of the Kentucky Code, commonly referred to as the Contraband Statute. This statute requires the Kentucky Department of Revenue to maintain a list of all tobacco companies currently in compliance with either the MSA or the Escrow Statute. The list, known as the "directory," must be available for public inspection and must contain the names of the complying tobacco manufacturers as well as all of the manufacturers' "brand families." *Id*. Pursuant to § 131.612 of the Kentucky Code, no distributor may affix a Kentucky tax stamp, which is required for lawful cigarette sales, to any cigarette package if the manufacturer of that brand of cigarette is not listed in the directory. Tobacco companies that do not abide by either the MSA or the Escrow Statute are therefore effectively prohibited from selling their cigarettes in Kentucky.

### 4.        *The alleged effect of the MSA and complementary legislation*

Shortly before the MSA was executed, the OPMs controlled approximately 97% of the cigarette market in the United States. By 2000, however, this percentage had decreased to 94.5%. One reason for this change, according to Tritent, is that the OPMs have increased the price per pack of cigarettes in response to the payments required by the MSA. Because many cigarette smokers make their purchasing decisions based on cost, the higher cost of the OPMs' cigarettes have resulted in a decrease in the OPMs' market share. The OPMs are now selling less cigarettes, which in turn lessens their payment obligations under the MSA (because the payments are subject to the Volume Adjustment). Because the MSA provides a disincentive for raising market share (in the form of higher payments to the settling states), the NPMs argue that the PMs are not willing to engage in price competition.

The NPMs, however, who are not obligated to make MSA payments or to follow the MSA's advertising restrictions, should hypothetically be able to increase their market share. Such an increase actually occurred prior to the enactment of the ASR Repealer. A report by the National Association of Attorneys General confirmed that the NPMs' market share greatly increased in the four years subsequent to the execution of the MSA. But the NPM Volume Adjustment reduces the PMs' payment obligations in the face of such competition by the NPMs. This means that any price competition mounted against the PMs by the NPMs is undermined because the NPMs' payments are based on the Escrow Statute rather than on the MSA, so that the NPMs do not enjoy a similar reduction. Therefore, any increase in the price per pack of cigarettes manufactured by the PMs is generally realized as additional profit rather than resulting in increased payments to the settling states.

The Escrow Statute, according to the NPMs, further reduces the potential for price competition because it requires all tobacco companies selling cigarettes in Kentucky—whether or not they have joined the MSA—to make similar payments to Kentucky. Finally, the Contraband Statute effectively prohibits NPMs from doing business in Kentucky if they do not abide by their obligations under either the MSA or the Escrow Statute. Tritent argues that these two Kentucky statutes collectively result in an anticompetitive scheme.

## II. ANALYSIS

### A.    Standard of review

We review de novo the district court's dismissal of a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Harvey v. Great Seneca Financial Corp.*, 453 F.3d 324, 327 (6th Cir. 2006). "A dismissal of a complaint may be affirmed if it appears that the non-movant can prove no set of facts in support of its claim that would entitle [it] to relief." *Id.* (citation and quotation marks omitted). Although reviewing courts must construe the complaint in the light most favorable to the plaintiff, accepting all factual allegations as true, a court is not required to "accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

### B.    Preemption under § 1 of the Sherman Act

Section 1 of the Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Tritent argues that the district court erred in refusing to hold that the Sherman Act preempts Kentucky's complementary legislation. As support for this proposition, Tritent claims that the Escrow and Contraband Statutes result in output restrictions that are classified by the Sherman Act as per se illegal and hard-core cartel agreements because they are designed to and, if enforced, do result in "supracompetitive prices." The district court assumed, for purposes of the motion to dismiss, that the activity about which Tritent complained—the "illegal output cartel"—did in fact exist. *See Great Seneca*, 453 F.3d at 327 (requiring a court, when considering a motion to dismiss under Rule 12(b)(6), to construe the complaint in the light most favorable to the plaintiff and to take all factual allegations as true). Tritent's contention regarding the legal effect of the complementary legislation, however, was not presumed by the district court. *See id.* (allowing the court to arrive at its own legal conclusions when reviewing a motion to dismiss). The legal effect of the complementary legislation guides our analysis of the Sherman Act preemption argument.

As in the typical preemption case, determining whether the Sherman Act preempts the Kentucky complementary legislation involves the inquiry of "whether there exists an irreconcilable conflict between the federal and state regulatory schemes." *Rice v. Norman Williams Co.*, 458 U.S.

654, 659 (1982). The existence of such a conflict must be more than hypothetical or potential. *Id.* ("A state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect.").

Whether a state statute that restrains competition is preempted by the Sherman Act requires a two-step analysis. First, Tritent must demonstrate that the complementary legislation "mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or . . . places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Id.* at 661; *see also 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345 n.8 (1987) ("Our decisions reflect the principle that the federal antitrust laws pre-empt state laws authorizing or compelling private parties to engage in anticompetitive behavior.").

If we conclude that Tritent has satisfied the first step of the preemption analysis, we must then consider whether the state statute is saved from preemption by the state-action immunity doctrine as set forth in *Parker v. Brown*, 317 U.S. 341 (1943) (holding that the state "as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit"). The rationale behind *Parker* immunity is that Congress, in enacting the Sherman Act, evidenced no intent to restrain state behavior. *Id.* at 351. In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980), the Supreme Court discussed *Parker* immunity in detail and established a two-part test for determining whether it saves a state statute from preemption by the Sherman Act: "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *Id.* (citation and quotation marks omitted).

We begin by addressing the first part of the Sherman Act preemption analysis—whether Kentucky's complementary legislation meets the *Rice* standard of mandating or authorizing anticompetitive behavior in all cases. Tritent argues that the Escrow Statute and Contraband Statute collectively authorize anticompetitive behavior. According to Tritent, the complementary legislation enacted by Kentucky to effectuate the provisions of the MSA punishes NPMs and rewards SPMs—a practice that constitutes an "illegal per se output cartel."

Tritent asserts that the two statutes operate as follows:

(1) When the OPMs and the settling states entered into the MSA, the price of cigarettes soon increased. This allowed the NPMs to become financially competitive with the OPMs (and later, the SPMs). Without the hindrance of the MSA payment obligations and marketing restrictions, the NPMs should have been able, at least in theory, to capture a larger market share.

(2) The Escrow Statute, as originally drafted with the ASR provision, allowed the NPMs to offer competitive prices so long as they targeted their sales on a regional basis. Once the Escrow Statute was amended by the ASR Repealer, however, the NPMs were no longer able to offer competitive prices. The ASR Repealer effectively eliminated price competition among cigarette manufacturers. Under the current scheme as it operates in Kentucky, because all cigarette manufacturers are required to make similar payments regardless of their participation in the MSA, the price per pack of cigarettes is essentially equal. Moreover, because the NPMs operate on a lower profit margin than do the larger PMs, the escrow payments—which are based on volume—amount to a penalty.

(3) The Contraband Statute provides the enforcement mechanism for Kentucky's statutory scheme. While the Escrow Statute requires NPMs like Tritent to make the yearly payments, the Contraband Statute prohibits the NPMs who have not met their monetary obligations under the Escrow Statute from selling their cigarettes in Kentucky (because the NPMs cannot obtain the necessary tax stamps). The complementary legislation, then, requires the NPMs to either raise their

prices to cover their payment obligations—which has the effect of prohibiting the NPMs from undercutting the PMs' prices—or to abandon the Kentucky market. This anticompetitive end result is allegedly mandated by the complementary legislation itself.

The accuracy of Tritent's characterization regarding the operation of the Kentucky statutes is the first issue that we must address on appeal. As discussed above, the Supreme Court in *Rice* made clear that in order to be preempted by the Sherman Act, the state statute in question must mandate illegal conduct in all cases. 458 U.S. at 661. This court had occasion to consider the *Rice* requirement in *McNeilus Truck and Manufacturing Co. v. Ohio*, 226 F.3d 429 (6th Cir. 2000). In *McNeilus*, the Ohio statute in question required dealers of remanufactured vehicles to either perform their own repairs or to enter into a binding contract with a dealer of new vehicles located within 20 miles of the selling dealer so that customers could obtain service on their vehicles without voiding the manufacturer's warranty. *Id*. at 434. If the dealer of remanufactured vehicles failed to comply with the statute, the statute gave the state the authority to revoke the dealer's license. *Id*.

McNeilus, a dealer of remanufactured vehicles, alleged that the Ohio law authorized anticompetitive behavior and was thus preempted by the Sherman Act. *Id*. at 435. Because it could not perform repairs in-house, McNeilus attempted to secure a binding contract with several different dealers of new vehicles. *Id*. at 436. All of the dealers within 20 miles of McNeilus's location refused. *Id*. According to McNeilus, these dealers participated in a "group boycott" because McNeilus imported its vehicles from out of state, a practice that angered the other Ohio dealers. *Id*. Because the group boycott was facilitated by the statute, McNeilus alleged that the statute was preempted by the Sherman Act. *Id*.

This court rejected McNeilus's claim. After recognizing  that a group boycott was illegal per se under the Sherman Act, the *McNeilus* court acknowledged that the Ohio law "facilitate[d]" the alleged illegal behavior. *Id*. at 441. Such facilitation, however, was not enough to support a holding of preemption. Even though the law had anticompetitive effects, the *McNeilus* court held that preemption was not called for because "the statute neither authorizes nor requires that dealers engage in behavior proscribed by the federal antitrust laws." *Id*. In other words, even though the statute encouraged, and even induced, the illegal behavior, McNeilus had no claim against the state. The court instead reasoned that McNeilus would have been better served bringing a claim against the dealers, because they were the actual perpetrators of the alleged anticompetitive behavior.

Despite the pronouncement in *McNeilus* that the encouragement of anticompetitive behavior does not result in Sherman Act preemption, Tritent argues that "it is difficult to conjure up a more obvious case of preemption than that presented by these implementing statutes." Tritent contends that the *McNeilus* court made clear that the lack of an explicit authorization in a State statute to promote or create an illegal per se activity is not dispositive of the preemption issue and is not the end of the inquiry.

We find Tritent's effort to distinguish *McNeilus* unpersuasive. This court in *McNeilus* essentially held that neither Ohio's enactment of a statutory scheme under which new vehicle dealers were able to boycott McNeilus's business, nor its enforcement of that scheme, were sufficient to require preemption under the Sherman Act. The anticompetitive behavior about which Tritent complains, and the relationship of that behavior to Kentucky's complementary legislation, is remarkably similar to the scenario considered in *McNeilus*. In both cases, the states (Ohio in *McNeilus* and Kentucky here) enacted statutes that facilitated anticompetitive behavior, behavior that we must presume (for the purposes of Rule 12(b)(6)) to be illegal per se under the Sherman Act. And, in both cases, the offending parties (the dealers of new vehicles in *McNeilus* and the PMs in the present case) would have been unable to effectuate the anticompetitive behavior without the benefit of the respective statutes. Tritent and the other NPMs in the present case, for example, might have been able to offer their cigarettes at lower prices per pack, and thus increase their market share,

had they been free of the monetary obligations resulting from the MSA and the complementary legislation.

As *McNeilus* makes clear, however, the facilitation, or even encouragement, of anticompetitive behavior is not sufficient to warrant federal preemption. Kentucky's complementary legislation, in order to be preempted, must "mandate or authorize" illegal behavior "in all cases." *Id*. at 440; *see also Rice*, 458 U.S. at 661.   The statutes in question do nothing of the sort.  They simply require that *all* tobacco companies—whether or not they choose to join the MSA—make payments to the state or face "blacklisting" from the Kentucky market.

The PMs' practice of increasing cigarette prices, thus keeping sales volume down, has allowed them to maintain a stable market share.  This has resulted in lower payments to the settling states.  If Trident and the other NPMs had chosen not to raise their prices in response to the PMs' price increase, the NPMs' market share would have presumably increased, but this would have subjected them to higher payments under the Escrow Statute.  Kentucky's current statutory scheme (in light of the ASR Repealer) thus provides a disincentive for the NPMs to engage in price competition with the PMs.  The genesis of this anticompetitive behavior, however, stemmed neither from the MSA nor the complementary legislation that Kentucky enacted to give effect to the MSA's provisions.  Instead, the behavior with which Trident *really* takes issue is the behavior of the PMs following the MSA's enactment.  Because such behavior was neither mandated nor explicitly authorized by the state of Kentucky, *McNeilus* forecloses Trident's argument on this issue.

Trident, however, relies on a case from the Second Circuit that reached a contrary result.  In *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004), the Second Circuit held that an NPM plaintiff had stated a cause of action under the Sherman Act because "the scheme as alleged threatens to become a permanent, nationwide cartel." *Id*. at 226.  The *Freedom Holdings* court focused on the relationship between the MSA and New York's complementary legislation.  It correctly noted that although the settling states were parties to the MSA, the agreement itself was also the product of joint negotiations among the OPMs. *Id*. at 224.  Classifying the MSA as an "express market-sharing agreement among private tobacco manufacturers," the *Freedom Holdings* court went on to hold that the NPM plaintiff in that case had satisfied the first prong of Sherman Act preemption analysis because New York's complementary legislation allowed the PMs to effectuate the anticompetitive behavior contemplated by the MSA. *Id*. at 226.

Once the *Freedom Holdings* court accepted as true the NPM plaintiff's allegations of anticompetitive behavior following the enactment of New York's complementary legislation, its analysis regarding the first preemption prong ended.  The *Freedom Holdings* court repeatedly characterized the complementary legislation as "allow[ing], "permit[ting]," and "empower[ing]" anticompetitive behavior, but the court never considered whether the statutes themselves mandated or authorized illegal conduct in all cases. Instead, the *Freedom Holdings* court essentially presumed that the NPM plaintiff had satisfied the first preemption prong simply by alleging a scheme under which anticompetitive behavior was prevalent. *See also Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 173 (2d Cir. 2005) (relying on *Freedom Holdings* to affirm the district court's denial of a motion to dismiss).

Such an approach is contrary to this court's decision in *McNeilus*.  Under *McNeilus*, Trident must make a showing that Kentucky's complementary legislation does more than simply "facilitate" anticompetitive behavior.  226 F.3d at 441.  In other words, the fact that the volume-based payment scale in the MSA and in the Escrow Statute influenced the PMs to raise their prices and lower their output is not enough to satisfy the first prong of the *Rice* preemption analysis.

The scenario considered by the *McNeilus* court represented a similar indirect effect.  In both cases, the competitors' behavior (other dealers in *McNeilus* and PMs in the present case) followed

the enactment of state laws that facilitated the anticompetitive scheme. This scenario, however, has been held by other courts to be insufficient in and of itself to warrant preemption of the complementary legislation. *See Xcaliber Int'l Ltd., LLC v. Kline*, No. 05-2261, 2006 WL 288705, *4 (D. Kan. Feb. 7, 2006) ("Stretching the Court's per se analysis to include the "effect" of [Kansas's complementary legislation], however, directly subverts the holding in *Rice* that "a state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect.") (quotation marks omitted); *S & M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 629 (M.D. Tenn. 2005) (citing *McNeilus* to hold that Tennessee's complementary legislation is not preempted by the Sherman Act because it neither mandates nor authorizes a violation of the antitrust laws); *Sanders v. Lockyer*, 365 F. Supp. 2d 1093, 1101 (N.D. Cal. 2005) ("The California statutes do not mandate, permit, or place irresistible pressure on manufacturers to take concerted action; rather they require unilateral action by each to make settlement or escrow payments.").

Because Tritent has failed to satisfy the first prong of Sherman Act preemption analysis, we need not consider the second prong's *Parker* state-action immunity doctrine. *See Rice*, 458 U.S. at 662 n.9 ("Because of our resolution of the pre-emption issue, it is not necessary for us to consider whether the statute may be saved from invalidation under the doctrine of *Parker v. Brown* . . . ."); *see also* Philip E. Areeda & Herbert Hovenkamp, 1 Antitrust Law § 217 (2000) (explaining that consideration of the *Parker* state-action immunity doctrine "would probably be essential" only in a case where a state statute mandated an activity otherwise illegal under the Sherman Act). We therefore conclude that Kentucky's complementary legislation is not subject to Sherman Act preemption.

**C.     Tritent's failure to show preemption precludes consideration of its hybrid-restraint claim**

Almost in passing, Tritent argues that Kentucky's complementary legislation meets the characteristics of a hybrid restraint as described in *324 Liquor Corp. v. Duffy*, 479 U.S. 335 (1987). A hybrid restraint exists where "private actors are . . . granted a degree of private regulatory power" by the state. *Id*. at 345 n.8 (quotation marks omitted). The presence of a hybrid restraint would obviate the requirement that Tritent demonstrate an "agreement" in order to prove unlawful behavior under the Sherman Act. If such a hybrid restraint conflicts with the Sherman Act, it may still be immune from Tritent's challenge if it meets the two-prong *Midcal* test discussed in Part II.B. above. *See Midcal*, 445 U.S. at 105 (holding that a hybrid restraint will not result in preemption if the challenged restraint is clearly articulated and affirmatively expressed as a state policy, and the state actively supervises that policy).

Tritent alleges that the present case includes a hybrid restraint because the complementary legislation allows PMs to "raise prices sufficiently with market share protection to pay the States and thereafter to retain as much as they could possibly realize from these protected price rises." The district court found no need to reach this issue, however, because it held that the complementary legislation does not mandate or authorize unlawful anticompetitive behavior. It thus concluded that the *Rice* standard is applicable to any challenged restraint in the Sixth Circuit, hybrid or not.

On appeal, Tritent all but abandons its hybrid-restraint argument by failing to challenge the district court's unwillingness to reach the issue. Tritent also fails to articulate why Kentucky's legislative scheme even constitutes a hybrid restraint. Instead, Tritent focuses its efforts on the two-prong *Midcal* state-immunity test, arguing that the complementary legislation is not immune from challenge because Kentucky fails to supervise the anticompetitive scheme. *See Midcal*, 445 U.S. at 105 (stating that the second-prong of the state-immunity analysis is whether the state actively supervises the anticompetitive restraint).

Supreme Court caselaw makes clear that the *Rice* preemption analysis—that is, whether the state statute at issue mandates or authorizes unlawful anticompetitive behavior—must precede the analysis under the hybrid-restraint theory. *See, e.g., 324 Liquor Corp.*, 479 U.S. at 345 & n.8 (striking down a hybrid restraint after determining that the legislative scheme was "inconsistent with § 1 of the Sherman Act"); *Rice*, 458 U.S. at 665-69 (Stevens, J., concurring in the judgment) (classifying *Midcal* and *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384 (1951), as cases involving hybrid restraints, and determining that "in both cases the Court had the benefit of a conclusive presumption that [the activity at issue] was anticompetitive"). As discussed above, Tritent cannot make the necessary preemption showing under *Rice*. This failure left the district court with the authority to avoid reaching a decision on the hybrid-restraint issue.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.