# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2370

_____

| | | |
|---|---|---|
| R & M Oil & Supply, Inc., an Illinois Corporation, | * * * | |
| Appellee, | * * | |
| v. | * * * | Appeal from the United States District Court for the Western District of Missouri. |
| John L. Saunders, Director, Department of Agriculture of the State of Missouri, | * * * * | |
| Appellant. | * | |

_____

Submitted: September 12, 2002

Filed: October 11, 2002

_____

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BOGUE,[1] District Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This case raises a constitutional challenge to a Missouri statute regulating the storage of propane. R & M Oil & Supply, Inc., filed an action against Missouri's

_____

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

Director of Agriculture requesting that the district court[2] declare that Mo. Rev. Stat. § 323.060.1 violates the commerce clause of the United States Constitution. The district court agreed with R & M and enjoined the statute's enforcement. The state appeals, arguing that the burden on interstate commerce that the statute creates does not exceed the local benefits derived from it. Because we agree with the district court that the state regulation burdens interstate commerce and provides minimal local benefit, we affirm.

I.

Propane is a fossil fuel by-product generated during the processing of natural gas and the refining of petroleum. Although propane is a versatile fuel with many uses, its primary use is as a home heating fuel in rural areas. Because Missouri produces no propane, propane-producing states deliver propane by pipeline to terminals located in or near the state. At those terminals, the propane is unloaded into the retailers' tanker trucks and delivered to their storage tanks. The retailers then use smaller trucks, called bobtails, to transport propane from storage tanks to the tanks of individual customers.

The demand for propane is, of course, significantly higher during the winter months. During periods of extreme cold, the supply of propane available through the pipelines is often insufficient to meet the increased demand. This may result in the rationing, called "allocation," of the available propane among the existing retailers. Retailers often experience substantial delays at the pipeline terminals – as long as six to eight hours – while waiting for their allocation. If the allocation does not meet their customers' demand, retailers must either travel a greater distance to another pipeline terminal or forego filling their customers' orders altogether. Pipeline breaks

_____

[2]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri, sitting by consent of the parties. *See* 28 U.S.C. § 636(c); *see also* Fed. R. Civ. P. 73.

and unfavorable road conditions during the winter months also occasionally disrupt the supply of propane.

Missouri asserts that the described shortages and disruptions in the propane supply led it to amend its statutes regulating the propane industry. One of these amendments, § 323.060.1, requires persons engaged in the bulk sale of propane at retail to maintain and operate a minimum storage capacity of 18,000 gallons in the state. The amended statute does not obligate retailers to keep an actual propane reserve and there is no requirement that the retailer actually use the tank. Complying with the statute costs retailers $25,000 for the purchase and installation of the storage tank, the market price for one acre of land (between $10,000 and $35,000, depending on location) upon which to locate the storage tank, and approximately $500 annually for maintenance and upkeep of the propane storage area.

R & M is an Illinois corporation engaged in the retail sale of propane with its principal place of business in Columbia, Illinois, which is near the Missouri border. R & M runs a typical retail propane operation. They obtain most of their oil from the Cahokia, Illinois, pipeline terminal, although they occasionally purchase propane at terminals in Wood River, Illinois, Jefferson City, Missouri, Moberly, Missouri, and Princeton, Indiana. After purchasing propane from the pipeline terminals, they transport it to Columbia where it is stored in one of two 30,000 gallon storage tanks. When a Missouri order is placed, one of two R & M drivers living in Hillsboro, Missouri, will drive a bobtail truck from Hillsboro to Columbia, Illinois, to pick up propane (a distance of 36 miles), then back to Missouri to deliver it. Because of the time that it takes to deliver the propane, R & M is able to serve only customers located within a fifty miles radius of its storage facility in Columbia.

II.

The facts are not in dispute, having been stipulated to by the parties. "Because our decision is predominantly one of determining whether the established facts fall within the relevant legal definition, albeit a constitutional definition, we apply a *de novo* standard of review" in deciding whether there has been a violation of the commerce clause. *Falls v. Nesbitt*, 966 F.2d 375, 377 (8th Cir. 1992); *see also Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 818 (8th Cir. 2001).

The commerce clause of the United States Constitution grants to Congress the power "[t]o regulate Commerce ... among the several States." Art. I, § 8, cl. 3. Even where Congress fails to legislate on a matter affecting interstate commerce, the courts have recognized that a "dormant implication of the Commerce Clause prohibits state ... regulation ... that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.' " *General Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980)). When a claim is made that a state statute violates the dormant commerce clause, we first determine whether the " 'law in question overtly discriminates against interstate commerce.' " *Hampton Feedlot*, 249 F.3d at 818. If it does, then the law is unconstitutional unless the state can demonstrate, "under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994)). A statute "overtly discriminates" if it is discriminatory on its face, in its purpose, or through its effects. *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067 (8th Cir. 2000). For purposes of this analysis, " 'discrimination' " means " 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " *Id.* (quoting *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)).

Section 323.060.1 requires persons engaged in the bulk sale of propane at retail to maintain and operate at least eighteen thousand gallons of storage capacity in the state. We agree with both parties that the challenged statute is facially neutral, as it requires both in-state and out-of-state businesses to maintain and operate a Missouri storage facility. R & M argues, however, that the statute has a discriminatory effect on out-of-state distributors. R & M maintains that the evidence shows that propane distributors tend to have their operational tanks where they are headquartered. In their view, out-of-state distributors must realistically maintain two storage facilities under § 323.060.1, while in-state distributors must maintain only one.

The difficulty with this claim, as we see it, is that R & M has not presented sufficient evidence to show such a discriminatory effect. The stipulated facts reveal only that of three propane distributors (R& M being one of the three), all three had storage facilities in their headquartered state, and one also had storage facilities in seven other states. We conclude that R & M has failed to prove that non-Missouri distributors must, as a practical matter, maintain more than one storage facility to operate in Missouri. Even if that showing had been made, we discern no basis for concluding that this places out-of-state distributors at a competitive disadvantage vis-a-vis distributors headquartered in Missouri. We find, therefore, that there is insufficient evidence to support the claim that the Missouri statute overtly discriminates against out-of-state propane distributors, either on its face or through its effects.

### III.

Although Missouri's statute does not overtly discriminate against interstate commerce, the law "may still violate the dormant Commerce Clause if the local interests that it serves do not justify the burden that it imposes upon interstate commerce." *U & I Sanitation*, 205 F.3d at 1069. We look at whether the local interest involved "could be promoted as well with a lesser impact on interstate

activities" to help us determine whether the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

We turn first to the local benefit that § 323.060.1 provides. The state argues that the statute is a health and safety regulation designed to protect those who rely on propane to heat their homes in the wintertime. But we question whether the Missouri statute will have any measurable tendency to prevent propane shortages, because the State presented no evidence to the district court that the propane storage capacity in existence before the passage of the statute was insufficient. In addition, we agree with the district court that the shortages that concerned the state stemmed "primarily from the pipeline delivery system as opposed to any claim of inadequate propane storage capacity." Finally, since § 323.060.1 does not actually require distributors to keep propane in the required tanks, as the district court found, the state has been unable "identify any actual benefit from the statute as currently written."

Even if we assume that § 323.060.1 is designed to further Missouri's legitimate interest in protecting the health and safety of its citizens, we are of the view that the local benefit actually derived from the statute is minimal or nonexistent. Like the district court, we find it most difficult to see how this statute will protect Missourians from propane shortages. It is even conceivable that the statute will have precisely the opposite effect. Given the choice between investing in a Missouri storage facility or not doing business in Missouri, R & M might well conclude that there is not enough existing or potential business in Missouri to justify the increased costs incurred by complying with Missouri law. Thus, Missouri citizens could very easily lose the benefit of R & M's existing storage capacity, some 60,000 gallons worth, located just miles across the border.

Finding relatively little local benefit in the statute as written, we turn to a consideration of the statute's burden on interstate commerce. The financial burden imposed upon R & M by the Missouri statute – an initial investment of $35,000 to $60,000 – is, standing alone, not in itself inconsequential. In comparing the putative local benefit of the statute to the burden imposed on commerce, moreover, we are not constrained (indeed, we are not allowed) to look only at the burden on R & M. Instead, we must look at the cumulative effects of the Missouri statute on all propane distributors. *See U & I Sanitation*, 205 F.3d at 1069. Although there is nothing in the stipulated record that indicates the number of propane distributors doing business in Missouri without in-state storage capacity, we think that it would be reasonable to assume that R & M is not alone.

In addition to the cumulative effects of the Missouri statute, we must also consider the "interstate effect on the [propane] market if several jurisdictions were to adopt similar [statutes]." *Id.* at 1069; *see also Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) ("[T]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering . . . what effect would arise if not one, but many or every, State adopted similar legislation."). Again, there is little evidence in the record to suggest how many distributors would find themselves in R & M's position if each state were to adopt statutes like Missouri's. But we would be turning a blind eye to reality if we did not acknowledge that such a situation could create a substantial burden on interstate commerce along the borders of states throughout the country. In any event, a precise aggregation is not necessary. We think that there is clearly a burden substantial enough to outweigh the *de minimis* putative local benefit of the law.

Finally, we consider whether the local interest involved "could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142. In circumstances similar to the present case, the Supreme Court struck an Arizona

regulation that prohibited a grower of high quality cantaloupes from transporting uncrated cantaloupes from its Arizona ranch to a nearby California city for packing and processing. *Id.* at 138-39. The following observation is particularly relevant to the present issue:

> [T]he Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually *per se* illegal.

*Id.* at 145. Like the regulation in *Pike*, Missouri's statute requires business operations that had evidently been performed efficiently outside the state to be performed in-state, at an increased cost. And Missouri had less burdensome alternatives available to it at the time that it enacted § 323.060.1. For instance, if there was a serious concern that propane distributors did not have enough storage capacity to meet their customers' demand during times of shortage (and there is no evidence that storage capacity was in short supply), Missouri could have required those distributing propane within the state to have a minimum storage capacity within a reasonable specified distance from (rather than in the same state as) their customers. This would have ensured an adequate storage capacity without requiring that business operations be performed on the Missouri side of the borders. There are no doubt other alternatives that also would impose less of a burden on interstate commerce than the statute at issue here. In accord with the presumption set forth in *Pike*, we do not think that § 323.060.1, which requires business operations to be performed in Missouri at increased expense, is the least burdensome means of promoting the state interest.

State statutes passed for the protection of the public's health and safety are generally constitutional despite the incidental burden they may impose on interstate commerce. But when a statute provides little or nothing in the way of demonstrable

legitimate local benefit, any significant burden on interstate commerce is burden too much.  Such is the case here.

## IV.

Accordingly, we affirm the judgment of the district court.


A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.