# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1436

_____

| | | |
|---|---|---|
| Grand River Enterprises Six Nations, Ltd., | * | |
| | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| Southwestern Trading Co., Inc.; The Ritchie Grocer Co., | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| Heber Springs Wholesale Grocery, Inc., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Arkansas. |
| Mike Beebe, in his official capacity as Attorney General, State of Arkansas, | * | |
| | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: January 15, 2009
Filed: August 4, 2009

_____

Before MURPHY and SMITH, Circuit Judges, and LIMBAUGH, District Judge.[1]

_____

SMITH, Circuit Judge.

Grand River Enterprises Six Nations, Ltd., and Heber Springs Wholesale Grocery, Inc. (collectively "appellants") allege that Arkansas Code Annotated § 26-57-261 ("Allocable Share Amendment") violates the Sherman Act and various sections of the United States Constitution and the Arkansas Constitution. Mike Beebe, in his official capacity as Attorney General for the State of Arkansas ("the State"), moved to dismiss the claims for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court[2] denied the State's motion insofar as it sought dismissal of appellants' claim that retroactive application of the Allocable Share Amendment violated their due process rights.[3] All other aspects of the State's motion were granted, and appellants brought this appeal. For the following reasons, we affirm the district court.

## I. *Background*

In the mid-1990s, 50 states and two territories ("settling states"), including Arkansas, filed suit against the country's major cigarette manufacturers. The action sought to recover Medicaid costs and other damages incurred by the states related to cigarette smoking and to impose restrictions on the cigarette manufacturers' sales and

_____

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

[3]The district court found that the retroactive application of the Allocable Share Amendment violated appellants' substantive due process rights. The State did not appeal that decision, and it is not relevant to this appeal.

advertising practices. These lawsuits were settled by the execution of the Master Settlement Agreement (MSA) on November 23, 1998.

A. *Master Settlement Agreement*

The MSA was executed by the settling states and the four largest cigarette manufacturers, known as Original Participating Manufacturers (OPMs).[4] This landmark settlement agreement banned certain advertising (particularly activities targeted at youth), restricted other activities such as lobbying, and obligated the OPMs to make payments to the settling states for all future cigarette sales in perpetuity. In exchange, the settling states released pending claims and agreed to forego future claims against the OPMs related to any recovery of healthcare costs paid by the states as a result of smoking-induced illnesses.

The MSA provides for annual payments by each OPM for the benefit of the settling states. The amount of each OPM's payment is based on that OPM's relative national market share. The settling states apportion the annual MSA payments among themselves according to each state's preset allocable share. Any OPM losing market share pays less to the settling states while an OPM gaining market share pays more.

Since 1998, more than 40 other tobacco manufacturers have joined the MSA and are known as Subsequent Participating Manufacturers (SPMs). SPMs and OPMs are collectively referred to as Participating Manufacturers (PMs). SPMs must also agree to abide by the MSA's restrictions in exchange for the settling states' release of present and future claims. As an incentive to join the MSA, any SPM that joined within 90 days after execution of the MSA is exempt from making annual payments to the settling states unless that SPM increases its market share beyond its 1998 levels

---

[4]The OPMs are Philip Morris, Inc., Lorillard Tobacco Company, Brown & Williamson Tobacco Corporation, and R.J. Reynolds Tobacco Company.

or beyond 125 percent of its 1997 market share. An SPM joining after the 90-day period must make payments based on that SPM's national market share.

Grand River was not a party to the MSA, has not since joined the MSA, and is considered a Non-Participating Manufacturer (NPM). An NPM may become an SPM simply by joining the MSA and complying with its payment provisions. To protect the market share of all PMs, the MSA allows settling states to enact a statute which forces NPMs to place money into escrow each year to settle future judgments. An NPM's payments into the escrow fund are dependent on the number of cigarettes that the NPM sells in that state in a given year.

## B. *Escrow Statute*

The MSA is a wholly contractual agreement that requires PMs to reimburse settling states based on the national market share of their cigarette sales. But because NPMs are not parties to the contract, they are not obligated by the MSA. Therefore, the settling states may not be able to collect future judgments from NPMs for harm caused by their cigarette sales. To address this problem, the MSA allows settling states to enact statutes requiring NPMs to place money in escrow each year based on their relative market share. States may use these escrow funds to recover tobacco-related healthcare costs. Arkansas originally enacted its statute ("Escrow Statute") in 1999 and amended it in February 2005. *See* Ark. Code Ann. §§ 26-57-260, 261.

The original Escrow Statute required NPMs to deposit funds into escrow[5] that would not be released for 25 years unless a court ordered otherwise. 1999 Ark. Acts 1165. The original statute also included an exception provision to permit early release of funds. Under this provision, an NPM could obtain the release of escrow funds that were "greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the [MSA]." *Id.*

---

[5]NPMs earn interest on these escrowed funds.

-4-

Although an NPM's escrow payments to a state were based on cigarette sales in that state, this escrow exemption provision allowed a return of the funds based on the relevant state's allocable share of the *national* MSA payments. *See id*. This provision, therefore, assumed that an NPM would sell its cigarettes nationally. Creative NPMs realized that this arrangement allowed them to concentrate their sales in a few states rather than many and thereby immediately recover most of their escrowed funds because the provision refunded escrow funds to the extent those funds exceeded each state's "allocable share" of the national MSA payment.

## C. *Allocable Share Amendment*

Early escrow fund releases frustrated the purposes of the Escrow Statute. States quickly discovered the apparent hole in the statute's fabric and sought to mend it. Consequently, the Arkansas legislature amended the statute in 2005 to address this concern. Act 384 of 2005, known as the Allocable Share Amendment, amended Arkansas Code Annotated § 26-57-261(a)(2)(B)(ii) to provide in relevant part as follows:

> (B) A tobacco product manufacturer that places funds into escrow pursuant to subdivision (a)(2)(A) of this section shall receive the interest or other appreciation on such funds as earned. Such funds themselves shall be released from escrow only under the following circumstances:
>
> \* \* \*
>
> (ii) To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the Master Settlement Agreement payments, as determined under section IX(i) of the Master Settlement Agreement including after final determination of all adjustments, that the manufacturer would have been required to make on account of the units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer . . . .

The Allocable Share Amendment calculates escrow releases by comparing the escrow payment for an NPM's cigarettes sold in Arkansas against its hypothetical MSA payment for those same cigarettes. The original statute calculated escrow releases based on Arkansas's share of the NPM's national cigarette sales. Because of appellants' regional sales strategy, they were able to take advantage of the original escrow statute and obtain early escrow releases. After the Allocable Share Amendment was enacted, appellants' regional sales concentration lost the potential advantage of accelerated escrow releases. Aggrieved by this statutory amendment, appellants challenged the legality of the legislative action on various federal statutory and constitutional grounds.

## D. *Procedural History*

Appellants brought suit against the State to permanently enjoin enforcement of the Allocable Share Amendment. They claimed that the Allocable Share Amendment violated federal and state antitrust law; Article 2, § 19 of the Arkansas Constitution; the First Amendment of the United States Constitution; Article 2, §§ 4 and 6 of the Arkansas Constitution; the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; Article 2, § 21 of the Arkansas Constitution; and the Commerce and Supremacy Clauses of the United States Constitution.

The State filed a motion to dismiss, alleging that appellants failed to state a claim for relief and that Heber Springs Wholesale Grocery, Inc. lacked standing to sue. The district court denied the motion objecting to standing. The district court granted the State's motion to dismiss on all claims, except those relating to the alleged retroactive effect of the Allocable Share Amendment.

Concurrently with the filing of its complaint, appellants also filed a motion for preliminary injunction, seeking to enjoin the application of the Allocable Share Amendment. The district court entered an agreed order maintaining the status quo

between the parties. Given that all claims for prospective relief had been dismissed and that the status quo would remain in effect pending resolution of the issue of retroactivity, the motion for preliminary injunction was denied as moot. Grand River seeks review of the district court's order.

## II. *Discussion*

We review a grant of a motion to dismiss under a de novo standard of review. *Taxi Connection v. Dakota, Minn. & E. R.R. Corp.*, 513 F.3d 823, 825 (8th Cir. 2008). We assume all factual allegations in the complaint are true. *Id*. at 826. But "the complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal." *Id*. The motion should be granted if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id*. (internal quotation marks omitted).

## A. *Sherman Act*

Appellants' complaint alleged that the Allocable Share Amendment violated state and federal antitrust law because it forces NPMs to raise their prices to prevent them from gaining a competitive advantage over PMs. The district court dismissed this claim, finding that the Allocable Share Amendment was not preempted by the Sherman Act. The district court found that because the statute did not mandate or authorize price-setting or output-fixing by private parties, it did not violate antitrust laws. On appeal, appellants contend that because the MSA, along with the Allocable Share Amendment, confers upon PMs complete discretion through pricing decisions to drive appellants out of the market, it amounts to a cartelization of the market. Moreover, appellants assert that because the Allocable Share Amendment imposes on NPMs a parallel cost or pricing structure, it amounts to a hybrid restraint of trade and is preempted by the Sherman Act. We must determine whether an actual antitrust violation occurred, and, if so, whether immunity applies.

## 1. *Per Se Antitrust Analysis*

The Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. To violate the Sherman Act, there must be "an irreconcilable conflict between the federal and state regulatory schemes." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). A "hypothetical or potential conflict is insufficient to warrant the preemption of the state statute." *Id*. A state statute is not preempted merely "because the state scheme might have an anticompetitive effect." *Id*. It may be preempted "only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Id*. at 661.

Appellants argue that they are faced with two equally anticompetitive choices: either (1) join the MSA and incur costs that are a function of and dependent upon the pricing decisions and output of appellants' competitors or (2) place a minimum amount into escrow based on the MSA, an agreement made by appellants' competitors and based on their market shares. This statutory framework, appellants allege, compels NPMs to incur a cost burden that is parallel (or identical) to that agreed to by and among competitors under the MSA.

We first inquire whether this statutory framework "is in all cases a *per se* violation" of the Sherman Act. *Id*. In *Rice*, respondents obtained a writ prohibiting the California legislature from enforcing California's liquor statutes. *Id*. at 656. The California Court of Appeals granted the writ, holding that the statute in question was *per se* illegal under the Sherman Act. *Id*. The Supreme Court reversed. *Id*. The statute required that alcohol may be brought into the state for delivery or use within the state "*only* if the beverages are consigned to a licensed importer" and provided that a licensed importer may not purchase or accept delivery of alcohol "unless he is designated as an authorized importer of such brand by the brand owner." *Id*. at

656–57. The California Court of Appeals held that this statutory scheme was a violation of the Sherman Act because it gave brand owners "unfettered power to restrain competition . . . by merely deciding who may and who may not compete." *Id*. at 658. The Court held that preemption cases require that there be an "irreconcilable conflict between the federal and state regulatory schemes." *Id*. at 659. "The existence of a hypothetical or potential conflict is insufficient to warrant pre-emption of the state statute." *Id*. A statute would not violate the Sherman Act "simply because the state scheme might have an anticompetitive effect." *Id*. The Court found it "irrelevant" that the distiller was granted the ability to restrict intrabrand competition and that this ability had the "imprimatur of a state statute." *Id*. at 662. The Court held, therefore, that the state statute did not violate the Sherman Act. *Id*.

Here, the Allocable Share Amendment does produce "an anticompetitive effect." But this effect is insufficient to constitute an antitrust violation. *See id*. at 659. Although the statute in question places some pressure on NPMs to charge higher prices to offset the escrow payments, this pressure does not force NPMs to raise prices "in all cases." *Id*. at 661. Indeed, NPMs are free to maintain their pricing structure despite the Allocable Share Amendment. *Cf. Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 99–100, 102–03 (1980) (holding that where the statute expressly required members of the wine industry to set price schedules for wine sales it amounted to a *per se* Sherman Act violation). The Allocable Share Amendment does not expressly allow price-fixing or output-fixing or other illegal behavior, nor does it place "irresistible pressure" on appellants to violate antitrust laws. *Rice*, 458 U.S. at 661. Therefore, the "irreconcilable conflict" required for preemption is not met. *Id*. at 659.

Appellants rely on *Freedom Holdings, Inc. v. Spitzer* for the proposition that the MSA was an "express market-sharing agreement among private tobacco manufacturers" and, therefore, the New York plaintiffs could establish Sherman Act preemption because the statute "allow[ed] OPMs to set supracompetitive prices that

effectively cause[d] other manufacturers either to charge similar prices or to cease selling." 357 F.3d 205, 224, 226 (2d Cir. 2004). But, on remand, the district court found that "the MSA does not 'mandate[] or authorize[] conduct that necessarily constitutes a violation of the antitrust laws in all cases, or . . . place[] irresistible pressure on a party to violate the antitrust laws in order to comply with the statute." *Freedom Holdings, Inc. v. Cuomo*, 592 F. Supp. 2d 684, 700 (S.D. N.Y. 2009) (quoting *Rice*, 458 U.S. at 661) (alterations in *Cuomo*). That court relied on updated data showing that NPMs have actually gained market share since implementation of the MSA and pay less per carton of cigarettes than PMs. *Id*. at 692.[6] The district court expressly rejected the Second Circuit's conclusion that "the MSA discourages growth and natural competition." *Id*. at 697. Relying on the aforementioned data, the district court found that "neither NPMs nor SPMs have acted as if discouraged." *Id*. The district court also cited testimony of the Chief Financial Officer of Freedom Holdings, who conceded that "their pricing decisions are made independently and that they are not compelled to follow price leadership by their larger competitors." *Id*. at 698. The court found that the plaintiffs had not been forced or mandated to fix their prices to OPM prices. *Id*. at 699. Therefore, the district court found that no cartel existed and that the plaintiffs failed to prove their antitrust allegations. *Id*. at 700.[7]

Moreover, *Spitzer* does not satisfy *Rice*'s preemption requirements. A state statute is preempted "only if it *mandates* or *authorizes* conduct that necessarily constitutes a violation of the antitrust laws *in all cases*." *Rice*, 458 U.S. at 661

---

[6]Specifically, NPMs controlled 0.4 percent of the cigarette market in 1997 but now control 5.4 percent of the market. And in 2007, NPMs paid $5.02/carton while OPMs paid $5.31/carton and SPMs paid $5.07/carton. *Cuomo*, 592 F. Supp. 2d at 692.

[7]The district court in *Cuomo* noted that, in *Spitzer,* the Second Circuit "accepted Plaintiffs' allegations as if proved, for it was reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)." *Cuomo*, 592 F. Supp. 2d at 700. Because the district court found that the plaintiffs failed to prove their antitrust allegations, that court stated that "the foundation for the [Second Circuit's] rulings does not exist." *Id.*

(emphasis added). The Second Circuit in *Spitzer* held only that the statute "allowed" a violation. 357 F.3d at 226. *Spitzer* did not hold that the state statute at issue mandated or authorized violative conduct in all cases. We decline to follow it.

Additionally, appellants cite *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001), in support of their preemption argument. The Third Circuit in *A.D. Bedell* held that the plaintiffs "properly pleaded an antitrust violation by alleging defendants agreed to form an output cartel." *Id*. at 249. The Third Circuit held that the states and the OPMs purposefully created a scheme that "creates powerful disincentives to increase cigarette production." *Id*. at 248. Under the MSA, PMs who increase production must increase their proportionate MSA payments. *Id*. Because lowering prices can increase market share, the increased MSA payments discourages price reductions. *Id*. To avoid gaining market share and thereby increasing proportionate MSA payments, PMs have an incentive to raise prices to match NPM's price increases. *Id*. This scheme, the court held, leads to an antitrust violation. *Id*. at 249. We disagree with the Third Circuit's conclusion that powerful disincentives are sufficient to constitute an antitrust violation under controlling Supreme Court precedent. Powerful disincentives may not produce the "irresistible pressure" which is required for an antitrust violation. *Rice*, 458 U.S. at 661. In addition, as outlined by the district court in *Cuomo*, we note that NPMs have actually *increased* their market share since the inception of the MSA. 592 F. Supp. 2d at 692.

The Sixth Circuit's decision in *Trident International Corp. v. Kentucky*, 467 F.3d 547 (6th Cir. 2006), and the Ninth Circuit's decision in *Sanders v. Brown*, 504 F.3d 903 (9th Cir. 2007), are more persuasive. In *Trident*, the Sixth Circuit denied preemption, holding that "the facilitation, or even encouragement, of anticompetitive behavior is not sufficient to warrant federal preemption." 467 F.3d at 557. The court went on to state expressly that "in order to be preempted, [the legislation at issue] must 'mandate or authorize' illegal behavior 'in all cases.'" *Id*. (quoting *McNeilus Truck & Mfg. Co. v. Ohio,* 226 F.3d 429, 440 (6th Cir.2000)). Likewise, in *Sanders*,

the Ninth Circuit held that the statutes at issue did not "explicitly allow price fixing, market division, or other *per se* illegal monopolistic behavior." 504 F.3d at 911. It refused to find a Sherman Act violation because "[n]othing . . . forces the NPMs to either peg their prices to those of participating manufacturers, or to refrain altogether from entering the market." *Id.*

Although the Arkansas statutory framework at issue in our case may have an anticompetitive effect, it does not mandate or authorize antitrust conduct in all cases. Essentially, appellants allege that the Sherman Act is violated because they are compelled to make payments into the state's escrow fund. Although these payments may increase the cost of doing business in Arkansas, they do not amount to an antitrust injury in violation of the Sherman Act. Appellants, therefore, have not proven that the Allocable Share Amendment amounts to a *per se* violation of the Sherman Act.

## 2. *Hybrid Analysis*

Appellants also argue that the "parallel" cost or pricing structure created by the MSA creates a hybrid restraint of trade in violation of the Sherman Act. A "hybrid" restraint of trade is a "nonmarket mechanism[]" that "merely enforce[s] private marketing decisions." *Fisher v. City of Berkeley*, 475 U.S. 260, 267–68 (1986). In other words, a hybrid restraint of trade occurs when the state passes a law that reinforces a decision by multiple companies to set a pricing scheme in violation of the Sherman Act.

The Supreme Court held that New York's liquor distribution statute was a "hybrid restraint" in *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345 n.8 (1987). In *324 Liquor*, a New York statute required liquor retailers to charge at least 112 percent of the "posted" wholesale price for liquor. *Id.* at 337. This price was set by liquor wholesalers that are private parties. *Id.* Appellants brought suit challenging the statute under the Sherman Act. *Id.* at 340. The Court noted that "industrywide resale price

maintenance . . . may facilitate cartelization." *Id*. at 341. The Court held that the New York statute was preempted because private parties set minimum prices for retailers which was then enforced by the state statute. *Id*. at 342. This statutory scheme amounted to a hybrid restraint on trade because the statute in question expressly granted authority to private actors to set prices. *Id*. at 345 n.8.

The Allocable Share Amendment operates differently than did New York's liquor distribution statute at issue in *324 Liquor Corp*. The Allocable Share Amendment does not mandate a minimum price or cost requirement for NPMs. Moreover, PMs have not been granted any regulatory power to set prices. The Allocable Share Amendment merely sets an amount that NPMs must contribute to the state fund as a cost of doing business in Arkansas. This escrow amount is set by multiplying the number of cigarettes the NPM sells in Arkansas by a per-cigarette amount set solely by the Arkansas legislature. This amount is not tied to PMs nor is it authorized by PMs. Therefore, the Allocable Share Amendment does not establish a hybrid restraint of trade.

### 3. *State Action Immunity Analysis*

The State contends that it is immune from liability under the doctrine announced in *Parker v. Brown,* 317 U.S. 341 (1943). In *Parker*, the Supreme Court held that antitrust laws were not intended to apply to states acting in their capacities as sovereigns. *Id*. at 352. To establish *Parker* immunity, the alleged restraint must be "clearly articulated and affirmatively expressed as state policy" and must be "actively supervised by the State itself." *324 Liquor Corp.*, 479 U.S. at 343.

The MSA was reviewed and approved by Arkansas's attorney general, properly enacted by the state's legislation, and duly signed by the governor. The MSA can thus be readily characterized as "state action" for *Parker* purposes. The Allocable Share Amendment was also enacted by the Arkansas legislature. As a legislative act, the amendment is not subject to the *Parker* requirements outlined in *324 Liquor. See*

-13-

*Hoover v. Ronwin*, 466 U.S. 558, 568–69 (1984) (holding that "[w]here the conduct at issue is in fact that of the state legislature . . . we need not address the issues of 'clear articulation' and 'active supervision'").

There are two distinct lines of cases flowing from the Supreme Court addressing *Parker* immunity. In *Midcal*, the Supreme Court held that, to invoke *Parker* immunity, the statute must be "one clearly articulated and affirmatively expressed as state policy" and must be "'actively supervised' by the State itself." 445 U.S. at 105. Later, in *Hoover v. Ronwin*, the Supreme Court established that all State statutes automatically receive the *Parker* cloak of immunity. 466 U.S. 558, 568–69 (1984).

In *Midcal*, the Supreme Court held that to grant antitrust immunity under *Parker*, the "challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'" and "the policy must be 'actively supervised' by the State itself." *Midcal*, 445 U.S. at 105. In that case, under California's wine selling scheme, wine producers set prices and wholesalers posted a resale price schedule. *Id*. at 99. The wine prices set by a single wholesaler within a trading area bound all wholesalers in that area, and anyone selling below that level faced fines or license revocation. *Id*. at 100–01. Midcal, facing sanctions for a violation of the statute, brought a writ of mandate asking for an injunction against California's wine pricing system. *Id*. at 100. The Court held that because the statutory scheme plainly constituted resale price maintenance, it violated the Sherman Act. *Id*. at 103. The next question for the Court was to determine whether there was enough state involvement in the scheme to establish *Parker* antitrust immunity. *Id.* The Court held that more must be shown than that "anticompetitive conduct is prompted by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Id*. at 104. The Court held that because California did not "actively supervise" the policy, the scheme did not have antitrust immunity. *Id*. at 105. The Court noted that California (1) "simply authorizes price setting and enforces the prices established by private

-14-

parties"; (2) "neither establishes prices nor reviews the reasonableness of the price schedules"; (3) does not "regulate the terms of fair trade contracts"; (4) and does not "monitor market conditions or engage in any 'pointed reexamination' of the program." *Id*. at 105–06. The Court famously stated that "[t]he national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Id*. at 106. According to the Court, "a state does not give 'immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . .'" *Id*. (quoting *Parker*, 317 U.S. at 351).

A few years later, in *Hoover*, the Court held that "the state action doctrine of immunity from actions under the Sherman Act" does not apply "to the grading of bar examinations by the Committee [on Examinations and Admissions] appointed by, and according to the Rules of, the Arizona Supreme Court." *Hoover*, 466 U.S. at 560. In *Hoover*, an unsuccessful candidate for the bar exam brought an action alleging that the Committee, as appointed by the Arizona Supreme Court to grade bar exams, had violated the Sherman Act by "artificially reducing the numbers of competing attorneys in the State of Arizona." *Id*. at 564–65. The Committee alleged that they were immune from antitrust liability under *Parker*. *Id*. at 566. The Court stated that "under the Court's rationale in *Parker*, when a state legislature adopts legislation, its actions constitute those of the State, . . . and *ipso facto* are exempt from the operation of the antitrust laws." *Id*. at 567–68. A decision by the state supreme court acting legislatively rather than judicially is immune from Sherman Act liability. *Id.* at 568. Because the action at issue was carried out by a committee rather than the state supreme court itself, the Court had "to ensure that the anticompetitive conduct of the State's representative was contemplated by the State." *Id*. "[I]n cases involving the anticompetitive conduct of a nonsovereign state representative the Court has required a showing that the conduct is pursuant to a 'clearly articulated and affirmatively expressed state policy' to replace competition with regulation." *Id*. at 568–69. The Court concluded that if the action is that of the state legislature or the supreme court,

then the danger of unauthorized restraint of trade does not arise and *Parker* immunity applies. *Id.* at 569. The Court held that because the Arizona Supreme Court merely delegated administration of the bar exam grading but retained final authority to grant admission to the bar, the conduct was solely that of the court. *Id.* at 572. Therefore, *Parker* immunity applied and the court was exempt from Sherman Act liability. *Id.* The Court stated that "[t]he reason that state action is immune from Sherman Act liability is not that the State has chosen to act in an anticompetitive fashion, but that the State itself has chosen to act." *Id.* at 574. Notably, the Court stated that "[t]he action at issue here, whether anticompetitive or not, clearly was that of the Arizona Supreme Court." *Id.*

After *Hoover*, it appeared that action by a state legislature was automatically granted *Parker* immunity without reviewing the *Midcal* factors. *Hoover*, 466 U.S. at 569. But it is not clear whether *Hoover* overruled *Midcal* or whether *Midcal* exists in limited contexts. *See Sanders v. Brown*, 504 F.3d 903, 916 (9th Cir. 2007) (stating that it is "unclear whether *Hoover* and *Midcal* are coexisting 'live' precedents"). Not surprisingly, the State argues that *Midcal* is inapposite and *Hoover* controls, a conclusion that would automatically shield the state statute at issue with state action immunity. *See Hoover*, 466 U.S. at 572. Appellants advocate the *Midcal* analysis as set out by the Supreme Court in *324 Liquor*, requiring a showing that "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'" and that "the policy must be 'actively supervised' by the State itself." *324 Liquor*, 479 U.S. at 343.

Although we have never had occasion to follow *Hoover*, it appears to be apposite to the instant facts. The State of Arkansas entered into the MSA and legislatively enacted the Allocable Share Amendment. Thus, we hold that *Parker* "state action" immunity applies. *Parker*, 317 U.S. at 350–51.

-16-

## B. *Commerce Clause*

Appellants next argue that the MSA violates the Commerce Clause because it requires NPMs to make payments to the State based on nationwide sales. Appellants assert that they must either enter the MSA and base their payments on national sales volume or annually fund an escrow account based on a national payment schedule. Appellants contend that this scheme violates the dormant Commerce Clause because it directly applies to commerce outside Arkansas.

The Commerce Clause grants to Congress the power "to regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. Where Congress fails to legislate on a matter concerning interstate commerce, the courts recognize "that a dormant implication of the Commerce Clause prohibits state . . . regulation . . . that discriminates against or unduly burdens interstate commerce and thereby imped[es] free private trade in the national marketplace." *R&M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 734 (8th Cir. 2002) (internal citations and quotations omitted).

A statute may violate the dormant Commerce Clause in one of three ways: (1) the statute clearly discriminates against interstate commerce in favor of in-state commerce, *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006); (2) it imposes a burden on interstate commerce that outweighs any benefits received, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); or (3) it has the practical effect of extraterritorial control of interstate commerce, *see Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).

The district court determined that the statute did not make a distinction between interstate commerce and intrastate commerce. The district court also found that any impact on interstate commerce was incidental. But the court did not address whether the statute's burdens on interstate commerce outweighed its benefits. We will address each aspect of the dormant Commerce Clause to determine if a violation has occurred.

## 1. *Discrimination Against Interstate Commerce*

When considering a dormant Commerce Clause violation, we must first determine "whether the challenged law discriminates against interstate commerce." *Jones*, 470 F.3d at 1267. A state statute discriminates against interstate commerce if it accords "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.*

Appellants contend that the Allocable Share Amendment directly regulates commerce occurring outside Arkansas's borders. But this argument is not persuasive. The Allocable Share Amendment does not make any distinction between in-state and out-of-state NPMs. The Amendment grants no "differential treatment" to in-state NPMs over out-of-state NPMs, thus avoiding violation of the dormant Commerce Clause. *Id.*; *see also Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 168–69 (2d Cir. 2005) (holding that New York's Allocable Share Amendment does not discriminate in favor of in-state manufacturers over out-of-state manufacturers).

## 2. *Pike Balancing Test*

State legislation is valid under the *Pike* balancing test if "the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The statute will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*; *R&M Oil*, 307 F.3d at 735.

The intended benefit conferred to the State by the MSA and the Allocable Share Amendment is readily apparent. States negotiated the MSA with the PMs to ensure reimbursement of future medical costs incurred by a state as a result of cigarette-related healthcare expenditures. Unquestionably, the State possesses a legitimate public interest in the health of its citizens. The Allocable Share Amendment allows recovery of projected medical costs caused by cigarette smoking incident to sales by

NPMs within Arkansas. NPMs pay no greater share than PMs. Any excess collected above the amount paid by PMs is returned to the NPM. Therefore, the statute regulates even-handedly to PMs and NPMs. *See Star Scientific, Inc. v. Beales*, 278 F.3d 339, 357 (4th Cir. 2002) (holding that Virginia's escrow statute serves a legitimate and important interest). Moreover, the statute applies evenly to both in-state NPMs and out-of-state NPMs. *See Spitzer*, 357 F.3d at 219 (holding that New York's escrow statute does not impose "unequal burdens on interstate and intrastate commerce"). Because the statute is not clearly excessive in relation to the legitimate interest received, it does not violate the Commerce Clause.

### 3. *Extraterritorial Effect*

Appellants assert that by requiring manufacturers to make payments to Arkansas based on nationwide sales, the Allocable Share Amendment supports an interconnecting system of regulation that effectively sets uniform higher prices nationwide in violation of the Commerce Clause. This argument also lacks merit.

In *Healy*, the Supreme Court held that a Connecticut law requiring out-of-state beer shippers to affirm that the prices at which their products were sold to wholesalers were no higher than the prices at which those same products were sold in neighboring states violated the Commerce Clause. 491 U.S. at 337–38 . The Court held this law violative of the Commerce Clause because it would create the "kind of competing and interlocking local economic regulation that the commerce clause was meant to preclude." *Id*. at 337. The Court considered the "price gridlock" that could occur if multiple states enacted "essentially identical" statutes. *Id*. at 339. Because the law had the practical effect of controlling liquor prices in other states and interfered with the regulatory schemes in those states, the statute violated the Commerce Clause. *Id*. at 338–39.

Appellants rely on the Second Circuit's decision in *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005). In *Grand River*, the plaintiffs

asserted that "the aggregate effect of the [statutes at issue] is to create a uniform system of regulation that results in higher prices nationwide." *Id*. at 171. The Second Circuit agreed, concluding that both the SPM settlement payments and the NPM escrow payments are tied to the national market share. *Id*. at 171–72. The court emphasized that the amount an NPM pays into the state's escrow fund is "keyed to the amount an NPM would have paid if it had joined the MSA as an SPM—a national-market-share-dependent amount—because the [NPM] is refunded any excess over what it would have paid under the MSA." *Id*. at 172. Therefore, the Second Circuit held that the plaintiffs "successfully stated a possible claim that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions." *Id*. at 173. The court also stated that "we take no position as to the ultimate viability of the dormant commerce clause claim." *Id*.

But on remand the district court denied the plaintiffs' request for an injunction, finding that they were unlikely to succeed on their dormant Commerce Clause claim. *Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02 Civ. 5068 (JFK), 2006 WL 1517603, at *9–10 (S.D. N.Y. June 1, 2006). The court stated that "[e]ven if, as the Circuit recognized, the amount of an escrow refund is, in part, keyed to the amount an NPM would have paid if it joined the MSA as an SPM—a national-market-share-dependent amount, Grand River has not shown that this scheme may result in interstate price control." *Id*. at *9 (internal quotations and citation omitted). Because the escrow statute at issue did not have any effect on cigarette prices or escrow payments by NPMs in other states, the dormant Commerce Clause was not violated. *Id*. at *9–10.

Likewise, the Allocable Share Amendment at issue here is not based on cigarette sales outside of Arkansas. NPM escrow payments are entirely a function of an NPM's sales in Arkansas. The payments are not based on nationwide sales. Nor has

there been a showing by appellants that escrow payments by NPMs in Arkansas have any effect, either directly or indirectly, on cigarette prices in other states. NPMs must make escrow payments *to* Arkansas based on that NPM's cigarette sales *in* Arkansas. Arkansas has no control over cigarette prices in other states. *See Star Scientific*, 278 F.3d at 356 (holding that Virginia's escrow statute does not have the "'practical effect' of controlling prices or transactions occurring wholly outside the boundaries of Virginia"). The MSA calculates an NPM's hypothetical MSA payment in order to refund the excess back to that NPM, but it does not allow Arkansas to control commerce in other states. *See KT&G Corp. v. Attorney Gen. of Okla.*, 535 F.3d 1114, 1144 (10th Cir. 2008) (disagreeing with the Second Circuit's decision in *Pryor*, 425 F.3d at 171–72, which found a "possible" dormant Commerce Clause violation based on the hypothetical refund). Because the statute does not affect interstate commerce, it does not violate the Commerce Clause.

## C. *Equal Protection Clause*

Appellants make two arguments that the Allocable Share Amendment violates the Equal Protection Clause by favoring PMs. First, appellants contend that Arkansas does not have a legitimate interest in providing benefits to PMs that are not also granted to NPMs. Where a social or economic policy is challenged on equal protection grounds and no fundamental constitutional right has been infringed, rational basis review applies. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *Minn. Senior Fed'n v. United States*, 273 F.3d 805, 808 (8th Cir. 2001). The challenger must "negative every conceivable basis which might support" the legislation. *Beach Commc'ns*, 508 U.S. at 315. Therefore, appellants have the burden of proving that the Allocable Share Statute has no rational basis.

The Allocable Share Amendment does treat PMs and NPMs differently. PMs that enter the MSA are required to deposit nonrefundable payments in perpetuity. The payments are dedicated to defraying the cost of future medical care that may be incurred by the state due to smoking-related illnesses. PMs also must adhere to

conduct limitations, such as advertising restrictions. In contrast, NPMs are not subject to the stricter conduct limitations, and their payments are only held for 25 years absent a judgment against them. This difference in treatment is rationally related to the state's legitimate interest in collecting future medical costs related to tobacco use. *See Star Scientific*, 278 F.3d at 352 (holding that NPMs essentially pay a surety bond for future liability in order to retain their ability to market as they see fit). Therefore, Arkansas's Allocable Share Amendment passes equal protection muster.

Second, Appellants argue that because the MSA exempted SPMs as an incentive to relinquish certain First Amendment rights, the statute deserves heightened scrutiny rather than the more deferential rational basis review. Appellant cites *Speiser v. Randall*, in which the Supreme Court held that where legislation affects free speech rights on a discriminatory basis, the state has the burden to show a compelling reason to sustain the legislation. 357 U.S. 513, 528–29 (1958). The granting of preferential exemptions to the SPMs for voluntarily limiting their advertising is not comparable to the legislative measures found suspect in *Speiser*. *Speiser* dealt with a California statute that denied tax exemptions to individuals unwilling to subscribe to a loyalty oath. *Id*. at 525. The statute here neither compels nor abridges free speech rights. In fact, because appellants are not parties to the MSA, they sell their products without state interference in their advertising choices. Appellants have not shown the SPM exemptions violate their right to equal protection of the law.

## D. *Due Process Clause*

Appellants argue that they have been denied due process because (1) Arkansas has no legitimate interest in mandating that appellants enter into a settlement with 51 other jurisdictions; (2) the Allocable Share Amendment has no rational relation to the purported State interest; and (3) the Allocable Share Amendment provides no notice or hearing or any judicial review for the lawfulness of the escrow payment.

Appellants' argument includes both a substantive due process component and a procedural due process component. We must determine (1) whether appellants have a substantive due process claim; (2) whether procedural due process requires that appellants be granted a pre-deprivation hearing before the State can take appellants' escrow funds; and (3) whether appellants' available post-deprivation remedy is constitutionally sound or runs afoul of procedural due process requirements.

## 1. *Substantive Due Process*

Appellants summarily state that the Allocable Share Amendment has no rational relation to the purported state interest it serves. But as we held in relation to the Equal Protection Clause, the State has a legitimate interest in collecting future medical costs related to tobacco. *See supra* Part II.C. Therefore, appellants' substantive due process claim likewise fails.

## 2. *Procedural Due Process*

Appellants next argue that the Allocable Share Amendment violates the Due Process Clause because they are not provided notice prior to the escrow payment's imposition. Appellants emphasize that the Allocable Share Amendment contains no mechanism for judicial review. Appellants also argue that giving up funds for potentially 25 years without the benefit of a hearing is overly burdensome. Procedural due process analysis follows the standards set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Eldridge* requires that we analyze the following factors: (1) private interest; (2) risk of wrongful deprivation; and (3) the government's interest. *Id*. at 335. After examining the *Eldridge* factors, we hold that Arkansas's interest in reducing smoking-related healthcare costs outweighs any private interest appellants assert.

First, appellants clearly have a private interest in any escrow payments that the statute requires them to forego for as many as 25 years. But we note that NPMs are paid interest on these payments. Second, because the escrow payments are tied directly to the number of cigarettes an NPM sells in Arkansas, there is minimal risk

of wrongful deprivation. Finally, we have previously held that Arkansas has a legitimate interest in reducing smoking-related healthcare costs. On balance, these factors weigh in favor of the State's interest. Additionally, before any escrow funds are permanently retained, the State must seek and be granted a court judgment or enter into a settlement with appellants. *See* Ark. Code Ann. § 26-57-261(a)(2)(B)(i). Based on these considerations, we hold that appellants' procedural due process rights have not been violated. *See KT&G Corp. v. Edmondson*, 535 F.3d 1114, 1142 (10th Cir. 2008) (denying appellants' procedural due process challenge to Kansas's and Oklahoma's allocable share amendments).

## E. *First Amendment*

Finally, appellants argue that the Allocable Share Amendment violates the First Amendment. In this cursory argument, they merely assert the undisputed existence of First Amendment rights to market their wares but fail to set forth any authority or persuasive legal argument that the Allocable Share Amendment violates their First Amendment rights. It is essentially an argument that, under the Allocable Share Amendment, they do not receive something received by companies that were willing to accept the State's terms. As the district court noted, what appellants are really complaining about is the loss of the competitive advantage that previously existed before enactment of the Allocable Share Amendment under the original Escrow Statute. Loss of a competitive advantage does not equate to an unlawful burden for appellants. *See Dos Santos, S.A. v. Beebe*, 418 F. Supp. 2d 1064, 1075 (W.D. Ark. 2006) (concluding that Arkansas's Allocable Share Amendment does not unconstitutionally burden free speech).

## III. *Conclusion*

Appellants' challenges to the Allocable Share Amendment were dismissed by the district court. After thorough review of their five arguments for reversal, we conclude that the judgment of the district court should be affirmed.

LIMBAUGH, District Judge, concurring in part and dissenting in part.

I respectfully dissent from the majority's holding that plaintiffs failed to state a cause of action on their Sherman Act claim. However, I would not reach the merits of that claim because I agree with the majority that even if plaintiffs stated a cause of action, the Attorney General of Arkansas is immune from Sherman Act liability (though not Commerce Clause liability) under the state action immunity doctrine announced in Parker v. Brown, 317 U.S. 341 (1943). Additionally, I respectfully dissent from that part of the majority opinion dismissing the Commerce Clause claim.

This is a difficult case, indeed, as seen by the conflicting holdings of the Circuit Courts in similar cases, and the principal opinion does an admirable job in outlining the respective positions. But all in all, I am persuaded more by the analysis in the cases that the majority acknowledges but rejects, than by the cases on which the majority relies.

A.

If I were to reach the Sherman Act claim, I would hold that the plaintiffs have stated a cause of action. The central allegations in their complaint are these:

> The Allocable Share Amendment's . . . design and purpose is to coerce Grand River and plaintiffs to raise the price of Grand River's cigarettes in Arkansas, thereby preventing Grand River's products from competing in the Arkansas market against Participating Manufacturers, particularly Subsequent Participating Manufacturers who have been granted payment exemptions that amount to hundreds of millions of dollars annually. The Allocable Share Amendment achieves this result by denying Grand River refunds on escrow payments that exceed the amount it would have paid Arkansas under the terms of the MSA.

* * *

-25-

If Grand River is deprived of its allocable share refund under the Amended Escrow Statute, its escrow costs relative to 2004 sales in Arkansas will far exceed the revenue Grand River received relative to those sales, thus placing Grand River at a financial hardship which threatens its future viability. In short, the Allocable Share Amendment effectively raises Grand River's escrow expense for 2004 by over $3,000,000,000 [presumably the amount of additional escrow expense nationwide from all states' allocable share amendments[8]]. In addition for 2005, Grand River will be forced to raise its prices, by more than $3.00 per carton, resulting in similar price increase to the remaining plaintiffs. This will result in significant loss of sales and market share for Plaintiffs and a loss of their trade relationships with retailers and distributors, particularly in comparison to grandfathered Subsequent Participating Manufactures.

The issue here, as framed by the majority, is whether the Allocable Share Amendment "places irresistible pressure on a private party [the plaintiffs herein] to violate the antitrust laws [the Sherman Act] in order to comply with the state statute [the Amendment]." This test is one of the standards under Rice v. Norman Williams Co., 458 U.S. 654, 661 (1982), for determining whether there is "an irreconcilable conflict between the federal and state regulatory schemes," id. at 659, and whether the state statute is thus preempted, id. at 659-61. The Sherman Act, of course, prohibits "restraint of trade or commerce among the several states." But as the majority correctly notes, again citing Rice, "[a] state statute is not preempted merely 'because the state scheme might have an anti-competitive effect,'" and it is for that reason that the "pressure" put on private parties to become anti-competitive in order to comply with the statute must be "irresistible." The ultimate question, then, is the degree to which the Allocable Share Amendment -- the state statute -- places "pressure" on plaintiffs to engage in restraint of trade in order to comply with the Amendment.

_____

[8]Plaintiffs later alleged that "the amendment increased Grand River's escrow payment obligation in Arkansas from approximately $600,000, to over $6,000,000, for sales in 2005 alone."

Although the majority concedes that the Amendment has an anti-competitive effect, it holds as a matter of law that the pressure on plaintiffs to succumb to that anti-competitive effect is not "irresistible." I would give the plaintiffs the opportunity to prove otherwise.

My concern is that the Amendment may well operate, consistent with plaintiff's allegations, to place irresistible pressure on plaintiffs to increase their cigarette prices to match those of the OPMs and SPMs which will correspondingly reduce plaintiffs' current market share. A statutory penalty -- the additional overall escrow expense caused by the reduction in refunds from their escrow payments -- is imposed against them if they refuse to do so. That is an expense they allegedly cannot bear and that will soon drive them out of business.

In my view, this statutory scheme is in the nature of a so-called "hybrid" restraint of trade, another form of state law that is per se illegal under the Sherman Act. Fisher v. City of Berkeley, 475 U.S. 260, 267-68 (1986) As the majority notes, a hybrid restraint of trade is a "nonmarket mechanism" (a state statute, for example) that "merely enforce[s] private marketing decisions." Id. In this case, the apparent effect of the Amendment is to enforce a parallel pricing structure dictated by the OPMs and SPMs that will in turn fix the relative market shares between the OPMs, SPMs and the NPMs for the duration of the MSA. The scheme thus deprives NPMs of the competitive advantage they held based on their choice not to enter into the MSA and clearly interferes with the market forces that establish cigarette prices. As such, it is illegal per se under the Sherman Act. See Nat'l Elec. Contractors Ass'n, Inc. v. Nat'l Constructors Ass'n, 678 F.2d 492, 501 (4th Cir. 1982).

In short, I agree with the opinion of the 3rd Circuit in A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc., 263 F.3d 239 (3rd Cir. 2001) which held that the state-by-state escrow scheme for NPMs -- even before the advent of the states' allocable share amendments -- was indeed an "output cartel" and thus a Sherman Act violation.

Id. at 249-50. This, in essence, was also the holding in Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205 (2d Cir. 2004), a case that deals directly with allocable share amendments. Although the majority, here, disparages the circuit opinion in Spitzer for the reason that the district court on remand found no facts to support the antitrust violation, that fact finding has no relation to the legal issue on which the circuit court based its ruling, which was that the plaintiff alleged facts sufficient to state a cause of action and thereby survive a motion to dismiss. And of course, the determination that the plaintiff failed in its proof in the Spitzer case is of no event because the facts in the case at hand may well be altogether different.

And finally, as I have noted, there is no need to decide the merits of the Sherman Act claim because in any event, the state of Arkansas is immune from liability.

## B.

I would find a dormant Commerce Clause violation for essentially the same reasons that I would find a Sherman Act violation, as extrapolated to the national market. It appears to me that the operation of the MSA and its enabling statutes, in conjunction with the Allocable Share Amendment, creates a parallel pricing scheme in restraint of trade that applies not only in Arkansas, but all other states that have adopted the same or similar versions of those various statutes.

In Healy v. The Beer Inst., 491 U.S. 324 (1989), the Supreme Court summarized the "cases concerning the extraterritorial effects of state economic regulation," stating:

> [A] State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states,". . . . The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. . . . [T]he practical effect of the statute must be evaluated not only by considering the consequences

-28-

of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Id. at 336 (citations omitted).

Although the Commerce Clause violation in Healy was clear cut because it involved a beer-pricing scheme that expressly applied to out-of-state shippers, the Healy court also was concerned that,

> the practical effect of this [beer-pricing statute], in conjunction with the many other beer-pricing and affirmation laws that have been or might be enacted throughout the country, is to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude.

Id. at 337. The court further warned against the "price gridlock" that could occur if multiple states enacted "essentially identical" statutes. Id. at 339-40.

Applying the Healy principles, the Second Circuit held that a Commerce Clause violation was properly pled in a similar Grand River case brought in New York. That case, Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158 (2d Cir. 2005) was accurately summarized in the majority opinion here, and that summary bears repetition:

> In *Grand River*, the plaintiffs asserted that "the aggregate effect of the [statutes at issue] is to create a uniform system of regulation that results in higher prices nationwide." *Id.* at 171. The Second Circuit agreed, concluding that both the SPM settlement payments and the NPM escrow payments are tied to the national market share. *Id.* at 171-72. The court emphasized that the amount an NPM pays into the state's escrow fund is "keyed to the amount an NPM would have paid if it had joined the MSA as an SPM – a national-market-share-dependent amount – because the [NPM] is refunded any excess over what it would have paid under the MSA." *Id.* at 172. Therefore, the Second Circuit held that the plaintiffs

"successfully stated a possible claim that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which is turn affects interstate pricing decisions." *Id.* at 173.

The Second Circuit's analysis in <u>Pryor</u> applies no less to the case at hand. Unfortunately, the majority's primary response to that analysis, like its similar treatment of the Second Circuit analysis in the <u>Freedom Holdings</u> case, is to criticize the opinion on the ground that the district court on remand found no violation. But again, the district court's fact finding has no relation to the legal issue on which the circuit court based its ruling, and the facts in the case at hand may well be different. Furthermore, the findings of the district court in <u>Pryor</u> (now <u>King</u>) are all the more insignificant because they were made pursuant to a request for preliminary injunctive relief, and in fact, the case is still in the discovery stage, see <u>Grand River Enters. Six Nations, Ltd. v. King</u>, No. 2 Civ. 5068 (S.D.N.Y. June 16, 2009), and has not proceeded to trial on the merits.

In dismissing the Commerce Clause claim, the majority also maintains that the Allocable Share Amendment "is not based on cigarette sales outside of Arkansas," that "NPM escrow payments are entirely a function of an NPM's sales in Arkansas," and that "[t]he payments are not based on nationwide sales." All this, however, is to discount the real basis of plaintiffs' claim, which, under <u>Healy</u>, is that the MSA and its implementing statutes, in conjunction with the Allocable Share Amendments, have created an interconnecting and interdependent system of regulation in the participating states. And the practical effect of this system, they allege, is that it requires NPMs to increase their prices both in Arkansas and nationwide so to avoid increasing market share that would in turn increase their escrow costs to a level that would be impossible for them to meet. In this way, the claim is indeed based, at least in part, on cigarette sales outside of Arkansas, and the escrow payment are not entirely a function of an NPM's sales in Arkansas, but instead are based, in part, on nationwide sales. Though

-30-

the majority also finds that "there has been [no] showing by appellants that escrow payments by NPMs in Arkansas have any effect, either directly or indirectly, on cigarette prices in other states," that finding ignores that the case is still in the pleading stage and that plaintiffs have not yet been given the opportunity to make such a showing.

In a way, plaintiffs' Commerce Clause challenge is really to the entire scheme of the MSA. The escrow obligations of NPMs under the Allocable Share Amendments are merely a small component of the larger MSA scheme -- a component that is designed to reign in non-MSA cigarette producers in order to perfect the goals of the MSA. Essentially, then, plaintiffs' position is that any statute that serves to implement or enforce the MSA is no less a Commerce Clause violation than the MSA itself. Regardless, I would hold that plaintiffs have made sufficient allegations in their complaint to establish that the "practical effect" of the Allocable Share Amendments (and the MSA) is to directly regulate interstate commerce, and for that reason, plaintiffs have stated a cause of action for a Commerce Clause violation.

_____